2024 UT App 142

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
AUSTIN JAMES CORRY,
Appellant.

Opinion
No. 20220074-CA
Filed October 3, 2024

Fourth District Court, Provo Department
The Honorable Anthony L. Howell
No. 191403596

Staci Visser, Attorney for Appellant

Sean D. Reyes and Natalie M. Edmundson,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN FORSTER
concurred.

LUTHY, Judge:

¶1      Austin James Corry, an assistant fire chief, pled guilty to
four counts of forcible sexual abuse of a female firefighter he
supervised. In its presentence report, Adult Probation and Parole
(AP&P) recommended a prison sentence even though the Utah
Sentencing Commission's Adult Sentencing & Release Guidelines
recommended that Corry serve up to 210 days in jail and Corry
had already served more than 210 days in pretrial detention. The
district court followed AP&P's recommendation and imposed a
prison sentence. On appeal, Corry contends that the court abused
its discretion in so sentencing him. He further contends that the
court erred by failing to resolve asserted inaccuracies in the

presence report. Corry also asserts that the court's use of his lack of treatment prior to sentencing as an aggravating factor constituted plain error and that his counsel's failure to object to the use of his lack of treatment as an aggravating factor constituted ineffective assistance of counsel. We discern either no error or no prejudice related to each of these claims and therefore affirm Corry's sentence.

¶2 Corry has also filed a rule 23B motion asserting ineffective assistance related to his counsel's failure to introduce at sentencing character letters besides those written by Corry's parents. We perceive no prejudice related to this failure and therefore deny Corry's motion.

BACKGROUND

*The Abuse*

¶3 In August 2018, Vicky,[1] a volunteer firefighter, reported to police that Corry had repeatedly sexually assaulted her. She later described the abuse as follows:

- In August 2015, Corry asked Vicky to come to the station to help with air tanks on a fire engine. When she arrived, she found that she was alone with Corry. Vicky was sitting in the passenger seat of a truck when Corry "grabbed [her] legs and pulled them towards . . . the door." She asked what he was doing, and he said, "[T]his [will] only take a minute. Come on." Vicky responded, "No, I got to get home to my kids." But Corry "pulled [her] legs up . . . so [she] was laying down" and then pulled down her sweatpants. "He pulled his pants down," "put his hand around [her]

---

1. A pseudonym.

throat," restricting her breathing, and put his penis "inside [her] vagina" until he ejaculated.

- Another time, Vicky came to the station to pick up new gear that had arrived for her. Corry was there alone. Corry instructed Vicky to try on her new pants at the station—as opposed to at home as she said she would—so that he could return them quickly if needed. Vicky left the room to try on her pants and returned to show Corry that they fit. Corry then "started touching" and "fondling" Vicky, including touching her breasts. He pulled at her pants as she walked away, then he "grabbed [her] and . . . tried pulling [her] into the bay" while she "kept telling him no" and "grabbing [onto] the doorway." He managed to move her into the bay and then pushed her against a fire engine, with her back to him. He put his hands down the front of her pants and touched her vagina, and he grabbed her hand and forced her to touch his penis. She "kept trying to put his hands off of [her]," but at some point she "just gave up." He pulled down her pants and "put his penis in" her.

- In April 2018, Corry told Vicky to come to the station to pick up some paperwork. When she arrived, she asked about the paperwork and said she needed to go, but he started touching her breasts, buttocks, stomach, and back over her clothing. She asked about the paperwork again and "told him that [she] felt like . . . every time [she] came down there it was a lie," then she tried to leave. However, she was unable to leave because he was holding her around her waist. He undid her belt and put his hand down her pants and into her vagina. He also touched her breasts. She continually tried to pull his arms off of her and was eventually able to leave by telling him she would come back later. Vicky had begun an audio recording on her phone before going into the station, and she later

explained that she had done so because she had reported previous abuse to Corry's father, who was the fire chief and a long-time deputy with the local sheriff's office, and he had blamed her for whatever had happened previously. So she "felt like [she] needed to record it or have some kind of proof at that point."

- On August 20, 2018, Vicky arrived at the station in response to a call for a fire. Corry told Vicky to ride with him in a brush truck. The call was eventually canceled, so Corry and Vicky returned to the station, where they were initially alone. Vicky heard Corry walking toward her, so she again began recording on her phone. She tried to walk away and leave the station, but he grabbed her and pushed her "against the brush truck." Corry proceeded to touch Vicky's breasts and "put his hands inside of [her]," despite her repeatedly asking him to stop. She "kept trying to push him away," but "there was not much [she] could do." Then Corry heard another fire truck coming around the corner and "immediately stopped," "did up his pants," and "went over and opened the bay door." Vicky told another firefighter that Corry had raped her, and she reported Corry's abuse to police. Corry texted Vicky later that night; the message read, "Hey I need to [apologize] to you about tonight. I am very sorry. I have been having some issues which is why I'm planning on moving and leaving the fire department. Hope you'll forgive me. Won't happen [again]."

- In addition to the instances described above, Corry "was constantly trying to grope" Vicky, with the abuse happening more frequently over time—to the point that he tried to touch her "[e]very chance he had." Vicky experienced suicidal thoughts due to the abuse. She decreased her involvement with the fire department to try

to avoid Corry, but she "loved being a firefighter" and "didn't want to leave the fire department."

### The Charges and the Plea Deal

¶4     Based on Vicky's allegations, Corry was charged with two counts of rape, two counts of object rape, five counts of forcible sexual abuse, and five counts of sexual battery. In November 2021, Corry pled guilty to four counts of forcible sexual abuse—each a second-degree felony—as part of a plea deal. Under the terms of this deal, the State agreed to dismiss the remaining counts, dismiss another case pending against Corry involving a charge of rape allegedly committed against another victim, and recommend concurrent sentences.

### The Presentence Report

¶5     AP&P prepared a presentence report. While the sentencing guidelines recommended a sentence of up to 210 days in jail and Corry had already been in pretrial detention for 568 days, AP&P deviated from the guidelines' recommendation and instead recommended a prison sentence. The presentence report contained a summary of the offenses, details from an interview with Corry, a copy of a typed statement submitted by Corry, a victim impact statement submitted by Vicky, character letters from Corry's mother and father, and a form identifying aggravating and mitigating circumstances.

### The Sentencing Hearing

¶6     The district court held a sentencing hearing in January 2022. At the sentencing hearing, the court asked Corry's counsel (Counsel) if he and Corry had "had an opportunity to review the presentence report." Counsel responded that they had and that there was "a lot of information in there that [Corry] had some serious difficulties with in terms of validity." Counsel requested

a continuance for there to "be a subsequent interview and review with AP&P just to validate and confirm some of the things that are presented in [the] report." The State objected to a continuance. The court and Counsel then engaged in the following dialogue:

> Court: . . . What objections to the presentence report do you wish to make?
>
> Counsel: . . . [Corry] believes that the information he provided was not adequately represented. And his belief is that AP&P failed to verify and validate some of his claims. . . .
>
> Court: . . . I certainly suggest that he disagrees with the characterization of the facts in this case, but [AP&P] is not charged as a fact finder to determine what did and did not happen in any particular case. . . . I am the fact finder. If there are issues of fact that need to be determined, it is me, I'm the one who makes that determination, not [AP&P].
>
> Counsel: And we appreciate that, Your Honor. Thank you.
>
> Court: So with that, are there corrections that need to be made to the presentence report?
>
> Counsel: At that point, Your Honor, other than the assertions made, we're ready to proceed.
>
> Court: Well, to be clear [Counsel], you haven't made any assertions. You've alluded to having assertions, but you haven't told me what those are.
>
> Counsel: . . . I guess specifically to our client the aggravated nature of some of the claims against him.

> Court: Okay. I'm happy to hear whatever you'd like me to know.
>
> Counsel: Just one second, Your Honor. Yeah, we're ready to proceed. Thank you.

¶7 The court then heard briefly from the State, which noted that AP&P was deviating from the sentencing guidelines because "Corry has proven himself to be a threat to the community" and because "[h]e continued to victimize the victim over the course of many years while in a position of authority and trust" as "her boss at the fire station."

¶8 The court then said to Counsel, "I don't even know if you are objecting to the recommendations in the presentence report." Counsel responded, "Your Honor, we're objecting to the deviation. We're objecting to the assertion that Mr. Corry was continually—continuing to participate in criminal activities. There's another statement that he was not seeking employment when this was during COVID and [he] was doing everything in his power that he could do." Counsel then referred to the form in the presentence report that contained a list of possible aggravating and mitigating circumstances, but he noted only a set of potential aggravating circumstances—"items 6 through 12"—that AP&P had not indicated were applicable to Corry. Counsel also referred to mental health or psychological treatment. As to Corry's failure to obtain such treatment, Counsel explained that Corry was "thinking, well, . . . I'm the defendant, why should I do that"; that Corry was "concerned if he did that, it may [have] impl[ied] that he's more guilty than he was"; but that Corry was "wide open to doing that." Finally, Counsel also pointed to evidence that Corry was currently employed and said, "So he is an active participating member of society, and . . . he is not a concern for public safety or any of that." Counsel then argued that Corry had already served sufficient jail time, and he recommended probation.

¶9      The court next heard again from the State. The prosecutor said:

> I will note that my biggest concern [is] those aggravating circumstances. And I think those aggravating circumstances—the offense caused substantial psychological or physical injury to the victim and the offense involved activity that continued over a significant period of time—are enough to justify the deviation and to justify sending Mr. Corry to prison.

The prosecutor noted that only one mitigating circumstance had been identified—that Corry had implemented positive educational or employment plans. He then asked Vicky to speak. Vicky explained the profound psychological impact of Corry's actions on her and the devastating consequences they had caused to her relationships, career, and life. Among other things, she stated, "I will hurt every single day for the rest of my life." She implored the court, "Please do not let him walk free. . . . Do not allow him to not face consequences for his actions."

¶10     Next, the prosecutor noted several concerns he had about Corry that he thought supported a prison sentence rather than probation. He said that in addition to the aggravating circumstances noted in the presentence report, Corry's written statement included in that report was "very highly concern[ing]," especially because in that statement, Corry blamed Vicky for his actions. The prosecutor explained that Corry claimed in his statement that Vicky "would come on to him," "that it was her fault," "that he never understood why she charged him with this," and that "he was shocked when he learned what the accusations were." The prosecutor averred that Corry's version of the events was a "rewriting of history, a rewriting of the evidence that's in the case." The prosecutor referred to the two recordings Vicky had made, which had been played during the preliminary

hearing, and noted that in them Vicky "is heard saying stop or no over and over and over and over." He continued, "I decided as we were preparing for our trial in this case to try to count in one of them how many times she said no or stop, and I gave up after 40 times in just one of the recordings." The prosecutor observed that Corry had even told police that he had heard Vicky say "no" approximately six times during one of their encounters, yet he did not stop. The prosecutor said:

> [Corry] seems to not remember that when he was speaking to police and describing one of his sexual encounters with [Vicky] that the police stopped him and said, "If we had a videotape of that incident and we were watching it right now, what would you call that?" And Mr. Corry's exact words were "I would call it rape." And somehow he forgets that he said that to police . . . .

The prosecutor noted how differently Corry described the events in his written statement and presented Corry's "blaming [of] everyone but himself" as "an additional aggravating factor that shows that Mr. Corry is a public safety risk here."

¶11 The prosecutor also observed that one of the reasons AP&P gave for its deviation from the guidelines was the fact that Corry had not sought treatment since he was released from pretrial detention. The prosecutor argued that these various concerns "show some pretty massive criminal thinking errors that the State believe[d] require[d] [it] to recommend . . . prison." The prosecutor further said: "I think that is the appropriate recommendation, given the length of time that the abuse happened . . . . The preliminary hearing showed that it continued for over three years."

¶12 After this, the court heard again from Counsel, who highlighted that the default recommendation under the

sentencing guidelines was "that [Corry] be sentenced from zero to 210 days in jail," that Corry's "risk to sexually offend" had been rated at "low or moderate," that Corry was "dealing with some serious problems of his own" when he committed the crimes, that Corry "recognized a need . . . to engage and enter into treatment," and that he believed Corry should receive credit for the nearly two years he had already served in jail.

¶13　Finally, Corry spoke. He apologized for his actions and expressed a willingness to "get the treatment" and "go through the counseling." He also attempted to explain his written statement, saying that he was "not trying to . . . blam[e] anybody else" but, instead, to "bring to light" "certain things." He then said: "I was having an affair with her. I should have never had an affair with her. And the reason I was shocked from the accusations is . . . what was brought forward to me under the circumstances on my part [was] consensual, and then it turned and [was] used against me."

¶14　The court then addressed Corry, saying:

> [W]hat is clear to me, Mr. Corry, is that [Vicky] knew when she went to the firehouse that day that you were going to sexually assault her. She knew it so much . . . that she hit record on her cell phone so that she would have evidence to go to the police with. . . .
>
> 　. . . [S]he didn't want to be sexually assaulted. And yet she, like so many others, was in a position where she didn't have much of a choice. You maintained power over her both physically and . . . through your supervisory power over her.
>
> 　But this is more . . . than just a sexual harassment case. This is a sexual assault case. In a

case, Mr. Corry, that you pled guilty to, to four reduced counts of forcible sexual abuse. And as I read through the presentence report, specifically through your statement, you take every opportunity to victim blame, to identify . . . mitigating reasons of how you didn't know what you were doing was wrong, et cetera. And if I'm being candid, Mr. Corry, they ring very hollow with me.

The court added, speaking to Vicky, "[T]oday I hope you find some relief that you will feel as though the cancer that is the pain of being the victim of such serious, awful crimes, that that cancer has been excised from you and that you may heal."

¶15     After this, the court sentenced Corry to a prison term of one to fifteen years for each charge, with the sentences to run concurrently and a recommendation to the Board of Pardons and Parole that Corry receive credit for the time he had already served. The court stated, "In weighing the aggravating and mitigating circumstances as well as the other information from the presentence report, I do find that the aggravating circumstances outweigh the mitigating circumstances, and I will adopt [AP&P]'s recommendation." It also said, "I will note for the record that . . . I have in no way considered the other case that was dismissed. I'm prohibited from doing that."

ISSUES AND STANDARDS OF REVIEW

¶16     Corry appeals his sentence. He first asserts that the district court erred by failing to resolve alleged inaccuracies in the presentence report. "Whether the trial court properly complied with a legal duty to resolve on the record the accuracy of contested information in sentencing reports is a question of law

that we review for correctness." *State v. Maroney*, 2004 UT App 206, ¶ 23, 94 P.3d 295 (cleaned up).

¶17    Second, Corry asserts that his not obtaining treatment before sentencing should not have been used as an aggravating factor. He argues both that the district court committed plain error in permitting that fact to be used as an aggravating factor and that Counsel provided ineffective assistance by not objecting on this point. "Claims for plain error and ineffective assistance of counsel present questions of law, which we evaluate for correctness." *State v. Samora*, 2022 UT App 7, ¶ 16, 504 P.3d 195, *cert. denied*, 525 P.3d 1254 (Utah 2022).

¶18    Third, Corry contends that the district court abused its discretion in sentencing him to prison rather than to probation. "This court reviews sentencing decisions for an abuse of discretion." *State v. Sanchez*, 2017 UT App 229, ¶ 2, 409 P.3d 156 (per curiam).

¶19    Finally, Corry moves this court for a remand pursuant to rule 23B of the Utah Rules of Appellate Procedure. He asserts that Counsel provided ineffective assistance by not submitting at sentencing various letters that had been written in his support by people other than his parents, which letters Corry wishes to now be admitted into the record. A rule 23B motion should be granted only where (1) the defendant provides affidavits supporting nonspeculative allegations of facts that are not in the record, (2) the alleged facts show deficient performance by defense counsel, and (3) the alleged facts demonstrate that the defendant was prejudiced by the alleged deficient performance. *See State v. Hatch*, 2019 UT App 203, ¶ 39, 455 P.3d 1103, *cert. denied*, 462 P.3d 801 (Utah 2020).

ANALYSIS

I. Alleged Inaccuracies in the Presentence Report

¶20    Corry first contends that the district court erred by failing to resolve alleged inaccuracies in the presentence report. We disagree.

¶21    Under the Utah Code, "[i]f there is an alleged inaccuracy in the presentence investigation report that is not resolved by the parties and the [Department of Corrections] or law enforcement agency before sentencing," "the alleged inaccuracy shall be brought to the attention of the court at sentencing" and "the court may grant an additional 10 working days after the day on which the alleged inaccuracy is brought to the court's attention to allow the parties and the department to resolve the alleged inaccuracy in the presentence investigation report." Utah Code § 77-18-103(5)(a).[2] However, "[i]f a party fails to challenge the accuracy of the presentence investigation report at the time of sentencing, the matter shall be considered waived." *Id.* § 77-18-103(5)(c).

¶22    This statute does not support Corry's claim of error because Corry never identified for the district court specific alleged inaccuracies in the presentence report. The code's reference to "an alleged inaccuracy in the presentence investigation report" that "shall be brought to the attention of the court," *id.* § 77-18-103(5)(a), confirms the common-sense notion that a defendant must identify specific items of information in a presentence report that are allegedly inaccurate; a defendant may not invoke the statute merely by claiming generally that the report is inaccurate. *See State v. Jaeger*, 1999 UT 1, ¶ 44, 973 P.2d 404

---

2. This subsection has been renumbered, but the language at issue has not been changed. *Compare* Utah Code § 77-18-103(5), *with id.* § 77-18-103(4) (2022). We therefore cite the current version of the statute for convenience.

(holding that an earlier version of the statute "require[d] the sentencing judge to consider the party's objections to the report, make findings on the record as to whether *the information objected to* is accurate, and determine on the record whether that information is relevant to the issue of sentencing" (emphasis added)); *State v. Johnson*, 2006 UT App 3, ¶ 3, 129 P.3d 282 (recounting the defendant's specific objections to particular information in the presentence report), *cert. denied*, 138 P.3d 589 (Utah 2006).

¶23    As recounted above, Counsel and the court engaged in a dialogue related to the presentence report, during which Counsel requested a continuance because there was "a lot of information in [the report] that [his] client had some serious difficulties with in terms of validity." But despite the court's persistent efforts to ferret out what specific information Corry was alleging was inaccurate, Counsel continued to make vague references to the contents of the report generally rather than identify any specific misstatements in the report. Eventually, the court pointedly asked Counsel, "[A]re there corrections that need to be made to the presentence report?" And Counsel responded that "other than the assertions made," Corry was ready to proceed. The court then stated, "Well, to be clear [Counsel], you haven't made any assertions. You've alluded to having assertions, but you haven't told me what those are." After another vague response failing to identify any specific alleged inaccuracies, Counsel again said Corry was ready to proceed. After this, Counsel indicated that he was objecting to AP&P's recommendation in the presentence report. But a sentencing recommendation is not a factual matter that implicates the statute dealing with the correction of inaccuracies.[3]

---

3. A defendant could, hypothetically, argue that a sentence recommendation is factually inaccurate if a different

(continued…)

¶24    Counsel's most specific statements were "We're objecting to the assertion that Mr. Corry was continually—continuing to participate in criminal activities" and "There's another statement that he was not seeking employment when this was during COVID and [he] was doing everything in his power that he could do." Counsel did not provide the court with any page numbers or otherwise refer to specific statements in the presentence report, and the presentence report does not contain these precise statements. In his reply brief, Corry attempts to tie these—again, vague—objections to specific statements in the presentence report, but this effort comes too late. "An objection must at least be raised to a level of consciousness such that the trial court can consider it." *John v. John*, 2023 UT App 103, ¶ 38, 536 P.3d 1138 (cleaned up).[4] Not only did Corry fail to raise any specific alleged

_____

recommendation is stated by the same recommender elsewhere. But Corry is not disputing the factual accuracy of the recommendation; instead, he is asserting that AP&P should have recommended probation instead of prison time.

4. Even if we were to credit Corry's allegations of specific inaccuracies, he would not prevail. Corry alleges that in one place the report inaccurately referred to his educational and employment goals, but in another place the report accurately identified Corry's education and employment status and also indicated that his positive educational or employment plans served as a mitigating factor. Thus, the error would have been harmless even if the court had erred by not correcting the allegedly inaccurate statement about Corry's educational and employment goals. Corry also takes issue with the statement that the abuse occurred "over a significant amount of time." But Vicky reported that the abuse occurred from August 2015 to August 2018, and Corry does not explain how the characterization "over a significant amount of time" is inaccurate in light of that

(continued…)

inaccuracies to a level of consciousness sufficient for the district court to consider them, but the court explicitly and repeatedly told Counsel that he had failed to do so. Because Corry "fail[ed] to challenge the accuracy of the presentence investigation report at the time of sentencing," we must consider the matter waived. Utah Code § 77-18-103(5)(c).

## II. Lack of Treatment as an Aggravating Factor

¶25 Corry next argues that his lack of treatment should not have been used as an aggravating factor for sentencing purposes. He asserts both plain error on the part of the district court and ineffective assistance of counsel based on Counsel not objecting on this point and not adequately advising Corry regarding the potential mitigating and aggravating factors the court might consider at sentencing. "To establish plain error, a defendant must show that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error was harmful." *State v. Samora*, 2022 UT App 7, ¶ 16, 504 P.3d 195 (cleaned up), *cert. denied*, 525 P.3d 1254 (Utah 2022). "An ineffective assistance of counsel claim, on the other hand, requires a defendant to prove both that counsel's performance was deficient and [that] the deficient performance prejudiced the defense." *Id.* (cleaned up).

¶26 Corry contends that he "had difficulty finding employment during the global pandemic that was reaching its height just as [he] was released" from pretrial detention and that this reality and the lack of local programs for sex offender treatment in his rural area made it "inappropriate" for AP&P and the district court to consider Corry's lack of treatment an aggravating factor. Corry's argument then relies on the Utah sentencing guidelines' warning that "[f]actors that reflect socio-

___

timeframe. Hence, even if Corry had raised this alleged inaccuracy to a level of consciousness in the district court, the court would not have erred by declining to "correct" it.

economic status more than risk" should be used "with caution" because "[a] person's relative abundance of resources or a lack of resources including access to treatment, financial stability, or ability to pay fines and fees, should not unduly affect the person's sentence." Utah Sent'g Comm'n, *2020 Adult Sentencing & Release Guidelines* 22 (2020) https://justice.utah.gov/wp-content/uploads/ 2020-Adult-Sentencing-and-Release-Guidelines.pdf [https://perma.cc/KG9X-EP2Y]. Corry further contends that while engaging in treatment can be a mitigating circumstance, "[i]t does not follow . . . that not seeking treatment prior to sentencing is an aggravating circumstance."

A.    Plain Error

¶27    Corry's argument of plain error on the part of the district court fails for two reasons. First, there is no per se prohibition against using lack of treatment as an aggravating factor. The warning Corry points to in the sentencing guidelines defeats Corry's argument that lack of treatment ought not qualify as an aggravating factor because the warning implies that the listed examples can serve as either mitigating or aggravating circumstances. And while the guidelines link "access to treatment" with "[a] person's relative abundance of resources or a lack of resources," they do not outright prohibit the consideration of factors linked to resources; instead, they urge caution when using such factors. *Id.*

¶28    Second, there was no indication to the district court that Corry's failure to obtain treatment "reflect[ed] socio-economic status more than risk" because Corry never connected his lack of treatment to his socioeconomic status before the district court. Corry certainly makes this connection on appeal, arguing that his treatment options were limited by his lack of employment opportunities and nearby providers. But Corry did not cite these considerations to the district court. Instead, Counsel explained to the district court that Corry was "thinking, well, . . . I'm the

defendant, why should I do that" and that Corry was "concerned if he did [obtain treatment], it may [have] impl[ied] that he's more guilty than he was." The court had no reason to believe that Corry's lack of treatment was based on any explanation other than the one Counsel provided. Based on the proffered explanation, Corry's lack of treatment did not reflect Corry's socioeconomic status at all, let alone "reflect [Corry's] socio-economic status more than [his] risk." *Id.* Accordingly, the court did not err—let alone plainly err—in considering this factor as an aggravating circumstance.

B.     Prejudice

¶29     Moreover, Corry was not prejudiced by the use of his lack of treatment as an aggravating factor. "To establish prejudice, it is not enough for a defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Instead, the defendant has the burden of showing that the decision reached would reasonably likely have been different absent [the] alleged errors." *State v. Samora*, 2023 UT 5, ¶ 22, 529 P.3d 330 (cleaned up).

¶30     While the district court did find "that the aggravating circumstances outweigh[ed] the mitigating circumstances" and adopted AP&P's recommendation that was based, in part, on Corry's lack of treatment, the court also stated that it weighed "the other information from the presentence report," which included Vicky's version of the events and Corry's written statement. And the court specifically addressed both Vicky's experience and Corry's statement. As to Vicky's experience, the court observed that due to Corry's repeated assaults, "Vicky knew when she went to the firehouse [in April 2018] that [Corry] was going to sexually assault her" and that because he "maintained power over her both physically and through [his] supervisory power over her," she "didn't have much of a choice." Regarding Corry's statement, the court noted that he had taken "every opportunity to victim blame" and to "identify . . . mitigating reasons," including by

claiming that he "didn't know what [he was] doing was wrong, et cetera." The court expressed clear disapproval of that victim blaming and of Corry's "hollow" "mitigating reasons" for his actions. The court also emphasized that through his plea deal, Corry was able to plead guilty to four *reduced* counts of forcible sexual abuse, and it referred to Corry's actions as "serious, awful crimes."

¶31 The court's statements indicate that in reaching its sentencing decision, it relied on the serious nature of Corry's repeated offenses and the lack of accountability the court felt Corry had taken for his actions. Among all this, the court made no specific reference to Corry's lack of treatment. Thus, we conclude, based on the court's own statements, that it is not reasonably likely that the court would have sentenced Corry to probation rather than prison if Counsel had objected to the use of Corry's lack of treatment as an aggravating factor or advised Corry more thoroughly regarding the potential mitigating and aggravating factors the court would consider at sentencing. In sum, Corry was not prejudiced by these alleged errors.

### III. Sentencing Corry to Prison

¶32 Corry next asserts that the district court abused its discretion by sentencing him to prison rather than to probation. Corry argues that various factors made him "the ideal candidate for probation" and that "no reasonable person would have sentenced [him] to prison rather than affording him the opportunity to prove himself on probation."

¶33 "We afford the sentencing court wide latitude and will reverse a sentencing decision only if it is an abuse of the judge's discretion." *State v. Scott*, 2017 UT App 103, ¶ 10, 400 P.3d 1172 (cleaned up). "A sentence constitutes an abuse of discretion when the sentencing court fails to consider all legally relevant factors, or the sentence imposed is clearly excessive." *Id.* (cleaned up).

"We will thus find an abuse of discretion only if no reasonable person would take the view adopted by the district court." *Id.* (cleaned up).

¶34 Even if it is true that Corry was a good candidate for probation, "a defendant in a criminal case is not entitled to probation." *State v. Irey*, 2017 UT App 178, ¶ 8, 405 P.3d 876 (cleaned up). And we disagree with Corry that no reasonable person would agree with the district court's prison sentence. "As an initial matter, we note that the court followed AP&P's sentencing recommendation, suggesting that the court's weighing of the factors in sentencing was not a view that no reasonable person would take." *State v. Wilkes*, 2020 UT App 175, ¶ 36, 479 P.3d 1142 (cleaned up), *cert. denied*, 485 P.3d 944 (Utah 2021); *see also Rita v. United States*, 551 U.S. 338, 347 (2007) (explaining that when a sentencing commission and a sentencing judge "have reached the same conclusion as to the proper sentence in the particular case[,] that double determination significantly increases the likelihood that the sentence is a reasonable one" (cleaned up)).

¶35 Moreover, the court's sentence of prison is not unreasonable in light of our legislature's directives. Pursuant to Utah Code section 76-3-203, "[a] person who has been convicted of a felony may be sentenced to imprisonment for an indeterminate term," specifically, "[i]n the case of a felony of the second degree, unless the statute provides otherwise, . . . for a term of not less than one year nor more than 15 years." That the legislature made imprisonment the default sentence for second-degree felonies and Corry pled guilty to four of them contradicts Corry's argument. Because defendants are not entitled to have sentences run concurrently, *see* Utah Code § 76-3-401(1)–(2), an even longer sentence than the one Corry received would still have

aligned with the presumptive sentence assigned by the legislature.[5]

¶36 Additionally, the particular circumstances of this case that the court identified support the court's sentence, specifically, (1) the "serious, awful" nature of Corry's crimes—the prosecutor stated that he had counted more than forty instances of Vicky saying "no" or "stop" in just one of the recordings; (2) the position of power Corry exploited to commit them; (3) the fact that Corry's abuse of Vicky spanned three years; (4) the devastating consequences on Vicky's life from Corry's abuse; and (5) the fact that Corry's plea deal involved the dismissal of ten other counts in this case (as well as a rape charge in another case, though the district court stated that it did not consider that charge in sentencing), *see State v. Akers*, 2018 UT App 235, ¶ 18, 438 P.3d 70 (indicating that courts may consider dismissed charges during sentencing).

¶37 Corry argues on appeal that the district court misinterpreted some of his comments in his written statement as "victim blaming" and a failure to take responsibility. However, appellate courts are not "to reweigh aggravating and mitigating factors or to second-guess a district court's sentencing determination," *State v. Martin*, 2017 UT 63, ¶ 76, 423 P.3d 1254, because district courts "are best situated to weigh the many intangibles of character, personality and attitude, of which the cold record gives little inkling," *State v. Killpack*, 2008 UT 49, ¶ 58, 191 P.3d 17 (cleaned up). The district court observed Corry

---

5. While the State agreed to recommend concurrent sentences, "[p]lea agreements are negotiated between the defendant and the State; the district court is not a party to the plea agreement. Thus, the court is not required to accept a plea agreement and is not bound by its terms." *State v. Hamilton*, 2018 UT App 202, ¶ 23, 437 P.3d 530 (cleaned up). The court therefore retained discretion to sentence Corry to consecutive prison terms if it so chose.

throughout the proceedings, and we credit its concern that Corry was not taking accountability for his actions, which concern was likely confirmed by Corry's comments during the sentencing hearing that painted his sexual activity with Vicky as a consensual "affair."

¶38 Given the foregoing, the court's imposition of a prison sentence rather than probation was not unreasonable and, thus, not an abuse of discretion.

## IV. Corry's Rule 23B Motion

¶39 Finally, Corry has filed a motion under rule 23B of the Utah Rules of Appellate Procedure, alleging that Counsel provided ineffective assistance by not submitting at sentencing letters that had been written by various people in support of Corry. Corry has supplied us with these letters, which—in Corry's words—demonstrate his character by speaking to his "strong community ties, support, and service" as well as "other aspects of Corry as a person that would have been helpful for the sentencing judge to know."

¶40 Again, a rule 23B motion should be granted only where (1) the defendant provides affidavits supporting nonspeculative allegations of facts that are not in the record, (2) the alleged facts show deficient performance by defense counsel, and (3) the alleged facts demonstrate that the defendant was prejudiced by the alleged deficient performance. *See State v. Hatch*, 2019 UT App 203, ¶ 39, 455 P.3d 1103, *cert. denied*, 462 P.3d 801 (Utah 2020). And "to establish prejudice, . . . the defendant has the burden of showing that the decision reached would reasonably likely have been different absent [the] alleged errors." *State v. Samora*, 2023 UT 5, ¶ 22, 529 P.3d 330 (cleaned up).

¶41 Even assuming arguendo that Corry can satisfy the first two elements—including that Counsel performed deficiently by

not providing some or all of the indicated letters to the court at sentencing—that failure was not prejudicial here. As described above, the court specifically focused on the "serious, awful" nature of Corry's crimes, the number of reduced charges he was pleading guilty to, his abuse of power over Vicky, the cancerous impact of Corry's actions on Vicky's life, and the fact that Corry's written statement repeatedly victim blamed and offered hollow assertions of mitigating circumstances to explain Corry's behavior. None of these factors relate to Corry's character apart from his actions in this case, evidencing that the court was focused on Corry's conduct in this case and its consequences, and that it likely would not have been swayed to impose a different sentence by additional statements supporting Corry's generally favorable character as attested to by his grandmother and members of the community.

¶42 And, indeed, the presentence report included letters written by Corry's father and mother that spoke to Corry's character, and we take the court at its word that it weighed "the other information from the presentence report" when deciding Corry's sentence. In these letters, the court was informed about Corry's community involvement, commitment to service and volunteerism, kind and helpful demeanor, and community support—the same themes present in the additional letters proffered through Corry's rule 23B motion. Despite the court having and considering this basic information as presented in the letters from Corry's parents, it focused on the already mentioned factors; we are not convinced that more voices on the topic of his general character would have changed the sentencing outcome.

¶43 We also do not agree with Corry's assertion that the additional letters would have contradicted AP&P's conclusion that Corry had "proven himself to be a threat to the community." AP&P appears to have based this conclusion on (1) the length of time Corry abused Vicky, (2) the fact that to accomplish the abuse he took advantage of his position of authority over Vicky, (3)

Corry's lack of treatment, and (4) the dismissed case wherein Corry had been charged with rape of a separate victim. And none of the letters address any of these points. Moreover, the prosecutor argued that "Corry [was] a public safety risk" for an additional reason not likely to have been contradicted by more letters of Corry's general character—i.e., that Corry continued to not take responsibility for his conduct and, instead, "blam[ed] everyone but himself." AP&P's and the prosecutor's reasons for asserting that Corry was a threat to the community had nothing to do with Corry's general demeanor or history of volunteering but everything to do with Corry's actions and attitude related to this case. Thus, introduction of additional letters of Corry's general character would have been unlikely to change either the court's assessment of the threat Corry posed to the community or its ultimate determination that the nature of Corry's actions in this case warranted a prison sentence. We therefore see no prejudice in Counsel's failure to introduce the additional letters, and we deny Corry's rule 23B motion.

CONCLUSION

¶44　Corry did not object to specific alleged inaccuracies in the presentence report, so his claim of error on that ground fails. The district court committed no plain error and Counsel did not render ineffective assistance related to the use of Corry's lack of treatment as an aggravating factor. And the court did not abuse its discretion in sentencing Corry to prison. Accordingly, we affirm. Additionally, because Corry has not alleged facts sufficient to demonstrate the prejudice needed to succeed on the ineffective assistance of counsel claim raised in his rule 23B motion, we deny that motion.

―――――――――