2026 UT App 34

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ENRIQUE REY RODRIGUEZ,
Appellant.

Opinion
No. 20210900-CA
Filed March 12, 2026

Second District Court, Farmington Department
The Honorable David M. Connors
No. 201700861

Scott L Wiggins, Attorney for Appellant

Derek E. Brown and Lindsey Wheeler,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1      Early one morning, a married couple (Husband and Wife) woke to find a burglar in their house. Husband confronted the burglar, resulting in a struggle and the burglar damaging his getaway vehicle while fleeing the property. Law enforcement identified the burglar as Enrique Rey Rodriguez, whom a jury later convicted of aggravated burglary and theft. At his subsequent sentencing hearing, Rodriguez personally raised concerns regarding the accuracy of his presentence investigation report (PSI). The trial court sentenced Rodriguez to concurrent indeterminate prison terms.

¶2      In challenging his convictions on appeal, Rodriguez argues that his trial counsel (Counsel) was constitutionally ineffective for

not moving for a directed verdict, for not objecting to a statement Wife made at trial, and for not requesting a reasonable-alternative-hypothesis jury instruction. In challenging his sentences, Rodriguez contends that the trial court erred in not resolving the claimed inaccuracies in the PSI before imposing sentence. We disagree on all fronts and affirm Rodriguez's convictions and sentences.

## BACKGROUND[1]

### *Burglary and Altercation*

¶3   Around 5:30 a.m. on December 26, 2019, Wife heard "creaking sounds" on the other side of her bedroom door. At first, Wife thought that one of her children was up and walking about. But after not hearing any additional noises her children tended to make in the morning, Wife decided to investigate. Wife opened the bedroom door and observed the figure of a "shorter, stocky" person holding a flashlight and walking toward the dining area on the floor below. Wife then shut the bedroom door, turned on the bedroom light, and shouted, "Someone is in our house!"

¶4   Husband, who up until then had been "dead asleep," leapt out of bed and ran into the unlit hallway yelling, "Get out of my house!" Husband heard someone on the lower floor run from the dining area toward the kitchen, and he pursued. From the top of the stairs, Husband observed that the burglar was a male wearing a dark hoodie. Husband went downstairs and took a shorter route to the kitchen, intending to cut the burglar off. The burglar ran out

---

1. "On appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Speights*, 2021 UT 56, n.1, 497 P.3d 340 (quotation simplified).

the kitchen door into the attached garage, and Husband continued to give chase.

¶5     The motion sensor light in the garage turned on and Husband saw the burglar, who was carrying a bag and some clothes in his arms, head toward a dark-colored sedan that had been left running in the driveway with its headlights on. The burglar discarded some clothes onto the driveway as he opened the driver side door and entered the car.

¶6     As the burglar shifted the car into reverse, Husband reached into the car and snatched several items from the burglar's lap, including the bag and some clothing. As the car started reversing, the open car door struck Husband, bruising his left calf and knocking him to the ground. Husband's "whole right side," including his hand, arm, hip, leg, and knee were all scraped as he slid on the pavement. The car continued in reverse and the car door hit a red fire hydrant at the end of the driveway. The impact bent the open door "backwards," and the car drove away with the door still open.

¶7     Husband was able to see the burglar's face during the driveway altercation. At trial, Husband described the burglar as a Hispanic male, "about 30 years old," "stocky," wearing glasses, and between 3 and 6 inches shorter than Husband, who is around 6'1''. After the altercation, Husband learned that the burglar entered the house through the garage door that Husband's son had inadvertently left open that night.

¶8     Husband and Wife called 911. As they waited for police to arrive, Husband looked through the bag he had retrieved from the fleeing burglar. Inside, among some items taken from the home (including a GoPro camera, car keys, and clothing), Husband found a flashlight that did not belong to them. He gave the flashlight to the responding officer who arrived shortly thereafter. Husband and Wife reported several items missing from their home, including a professional camera, clothing, drills, and motorcycle helmets.

¶9     The responding officer found the missing camera on the driveway. After walking through the house, the officer decided against calling crime scene investigators to dust for fingerprints because the home was "contaminated with multiple fingerprints." The officer's written report stated that Husband described the burglar as "a Hispanic male, about five foot six," and wearing glasses. The officer issued an "Attempt to Locate" (ATL), via dispatch, to other law enforcement officers for a male matching the description Husband provided, with the further information that the suspect was driving a dark sedan.

*Vehicle Theft*

¶10     Rodriguez had been staying with his parents over the Christmas holiday and had slept at their house on Christmas night. At around 7:15 a.m. the next morning—the same morning as the burglary—approximately three miles away from Husband and Wife's house, Rodriguez's mother (Mother), who had arisen at 5:45 a.m., was about to leave for work when she discovered her dark blue sedan was missing from her attached garage. Other than the sedan, nothing else was missing from the garage. Rodriguez's father (Father) had parked the sedan in the garage around 10:30 p.m. the night before, and Mother last saw it around 11:30 p.m.

¶11     The missing sedan required a key fob that was uniquely programmed to start that car. Mother had two key fobs for her car: she kept one in her purse, which she hung in her bedroom at night, and Father held onto the other one. The garage from which the car went missing could be opened one of two ways: by pressing a button in the garage next to the door leading into the house or by using one of at least two garage door remotes. The house also had a security system for which only Mother knew the code. When set, the alarm would go off whenever anyone entered or exited the house through a regular door, but the garage door as well as the windows to two bedrooms—including the bedroom in which Rodriguez was staying—did not have sensors. Mother had

set the alarm that night, and it was not set off by anyone entering or exiting the home. But the following morning, Mother discovered that the security system's cameras were not working and did not record the theft of her car. This malfunction was apparently due to Mother and Father replacing their internet modem a few days earlier without also informing the security company of the change.

¶12 Mother reported her car as stolen to law enforcement. The responding officer encountered Mother, Father, and Rodriguez at the house. Mother showed the officer that her key fob was still in her possession. After obtaining a vehicle theft affidavit from Mother, the officer issued an ATL for the missing car. The officer also learned that an ATL for a car matching the sedan's description had been issued earlier that morning.

¶13 Later that day, Mother contacted OnStar, which tracked the car's GPS to a location just four blocks from her house. Police found the car at that location. The driver side door had sustained "pretty severe damage" and was almost entirely detached. Red paint transfer was also found on the door, which was consistent with the door hitting a fire hydrant. Police also found a garage door remote in the glovebox. Mother was "[s]hocked" when the remote was returned to her because it was supposed to be in her dresser. Police informed Mother that her car had been involved in a burglary earlier that morning.

¶14 Police found no evidence that Mother's car had been started by anything other than its own key fob. The car was not conducive to fingerprinting because a passenger window and the driver side door had been left open, causing the interior to be soaked by rain.

*Investigation*

¶15 After consulting one another, investigators assigned to the burglary and vehicle theft cases determined that Rodriguez fit Husband's description of the burglar. Husband was asked to view

a photo lineup, but he could not identify the burglar "with 100 percent certainty."

¶16   A detective (Detective) interviewed Rodriguez, who denied stealing Mother's car. Rodriguez claimed to have been at his parents' house on the morning in question, and he stated that Father had seen him going into the bathroom at around 4:30 a.m. Rodriguez told Detective that the culprit was an acquaintance named Tyler, whom he had met through a mutual friend. Rodriguez suggested that Tyler had stolen the car in retaliation for a deal in which Tyler felt "cheated" by Rodriguez. Rodriguez stated that Tyler had admitted to him that he had taken the car. Rodriguez explained that he kept a garage door remote to his parents' house in his personal vehicle, which Tyler "potentially" took while Rodriguez's car was parked at the mutual friend's apartment complex. Rodriguez also told Detective that because Tyler had not worn gloves, his fingerprints should be in Mother's vehicle. Rodriguez claimed not to know Tyler's last name, and he declined to disclose the mutual friend's name to Detective, stating that he did not wish to get the friend "involved in this situation." Rodriguez described Tyler as "older," probably in his forties, and around 5'2" or 5'3''. He also indicated that Tyler was staying at the mutual friend's apartment.

¶17   A forensic analysis did not reveal any latent fingerprints on the burglar's flashlight. But DNA was found on one of the batteries inside the flashlight. And a few weeks after the interview, Detective obtained a warrant to gather Rodriguez's DNA via buccal swab. Rodriguez's DNA matched the DNA found on the flashlight's battery. A search of Mother and Father's house did not reveal any of Husband's or Wife's property.

*Trial*

¶18   In connection with the burglary, the State charged Rodriguez with one count of aggravated burglary, a first-degree

felony, and one count of theft, a third-degree felony.[2] A two-day jury trial was held in September 2021. The State called several witnesses as part of its case-in-chief, including Husband, Wife, Mother, Father, Detective, other investigating officers, a car dealership employee, and a forensic biologist. Their pertinent testimony is summarized above.

¶19    Notably, during Counsel's cross-examination of Wife, Counsel asked whether law enforcement ever offered "any kind of description" of the suspect they had in custody, such as whether the person was "[m]ale or female." Wife answered, "I don't think they ever gave a description. . . . Maybe that it was male." Counsel pressed further, "Okay. What kind of information did they give you?" Wife replied, "I'm trying to remember the conversation, just that he was in jail for something else." Counsel did not object to this response. Instead, he asked, "Okay, all right. With regard to a description of the person, anything?" Wife answered, "I mean, I know my husband went in and looked at different people, but I don't know that we ever went over descriptions." Counsel ended the cross-examination at that point.

¶20    The defense did not call any witnesses. During closing argument, Counsel argued that the State had failed to establish the burglar's identity. He asserted that the DNA found on the flashlight battery did not incriminate Rodriguez because the flashlight may very well have been in Mother's car at the time it was stolen. Counsel also pointed to Husband's statement to the responding officer that the burglar was 5'6'' and to Husband's trial testimony that the burglar was between 3 to 6 inches shorter than Husband, arguing that Rodriguez, who is 5'10'', falls outside this range.[3] And in light of Husband's inability to positively

---

2. The State did not charge Rodriguez for the theft of Mother's car.

3. Counsel stated that Husband is "just over 6-foot" tall, making the height range for the burglar between 5'6'' and 5'9''. But

(continued…)

identify the burglar in a photo lineup, Counsel asserted that this height discrepancy was "important" and "substantial." Counsel also emphasized the logistical difficulties of Rodriguez leaving his parents' house and taking Mother's car without setting off the security system. This included climbing out the bedroom window, opening the garage door with a remote, taking the car, burglarizing Husband and Wife, and returning to his parents' neighborhood with the vehicle before Mother awoke around 5:45 a.m.—all the while believing that the security system's cameras were working.

¶21 Following closing arguments, the court instructed the jury. As relevant to this appeal, the elements instructions for each charge directed the jury that to convict Rodriguez, it had to "find beyond a reasonable doubt each of the following elements." The instructions then listed the elements pertaining to each charge. Another instruction defined the "proof beyond a reasonable doubt" standard for the jury:

> [P]roof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If the evidence leaves you firmly convinced that the defendant is guilty of the crime charged, you must find the defendant guilty. On the other hand, if there is a real possibility that the defendant is not guilty, you must give the defendant the benefit of the doubt and return a verdict of not guilty.

---

Husband testified that he is "about six foot one," actually making the upper range for the burglar's height 5'10''.

¶22     The jury convicted Rodriguez on both charges. The court then ordered Adult Probation and Parole (AP&P) to prepare a PSI.

*Sentencing*

¶23     The PSI recommended that Rodriguez serve prison sentences for his convictions, and it provided the following summary of Rodriguez's criminal history. In 2006, Rodriguez was placed on probation for burglary, but by the end of that year, the probation was terminated and he was charged with additional offenses. As a result, Rodriguez was incarcerated until 2011, when he was released on parole. But three months later, due to subsequent parole violations, including substance abuse, Rodriguez returned to prison for two more months until his sentence was discharged. Upon his release in 2011, Rodriguez "immediately returned to criminal activity," resulting in five new charges for theft and burglary. For those charges, Rodriguez served time in prison until 2018, when he was released once more on parole. Rodriguez "performed poorly while on parole" due to repeatedly testing positive for controlled substances, failing to maintain employment, and failing to report to AP&P, which ultimately resulted in him returning to jail for 5 days. Rodriguez thereafter was released and continued to test positive for controlled substances until his arrest in the current matter.

¶24     At Rodriguez's sentencing hearing, held in November 2021, the trial court asked whether there were "any comments or corrections" relating to the PSI. Counsel answered, "No," but Rodriguez then spoke up, stating, "Yeah, I would like to say something." Rodriguez told the court that the PSI "says a whole bunch of things . . . that's incorrect." When asked to elaborate, Rodriguez stated, "I'd like to correct that when I was on parole, I was doing well. . . . It just makes it seem like that every time I've been on probation or parole, I've gotten violated, which is a lie." The court then asked whether the State or Counsel had "[a]ny input" on what Rodriguez had just stated. Counsel answered, "No, I'll just let him make a record of it."

¶25 The parties then proceeded to argue about sentencing, following which Rodriguez addressed the court again, insisting on his innocence. The court sentenced Rodriguez to concurrent indeterminate prison terms: five years to life for the aggravated burglary conviction and up to five years for the theft conviction.

ISSUES AND STANDARDS OF REVIEW

¶26 Rodriguez appeals both his convictions and sentences. In challenging his convictions, Rodriguez contends that Counsel was constitutionally ineffective in three instances: (1) for not moving for a directed verdict, (2) for not objecting to Wife's statement that he "was in jail for something else," and (3) for not requesting a reasonable-alternative-hypothesis jury instruction. "When an ineffective assistance claim is raised for the first time on appeal, it presents a question of law that we address in the first instance." *State v. James*, 2026 UT App 20, ¶ 32 (quotation simplified).

¶27 In challenging his sentences, Rodriguez argues that the trial court failed to resolve alleged inaccuracies in the PSI before imposing sentence. "Whether the trial court properly complied with a legal duty to resolve on the record the accuracy of contested information in sentencing reports is a question of law that we review for correctness." *State v. Samulski*, 2016 UT App 226, ¶ 9, 387 P.3d 595 (quotation simplified), *cert. denied*, 390 P.3d 725 (Utah 2017).

ANALYSIS

I. Ineffective Assistance of Counsel

¶28 To succeed on a claim of ineffective assistance of counsel, a criminal defendant must show that (1) defense "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687

(1984). "Failure to establish either prong is fatal to a defendant's ineffective assistance claim." *State v. King*, 2010 UT App 396, ¶ 30, 248 P.3d 984.

¶29 Under the first prong, defense counsel's performance is deficient if it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "Judicial scrutiny of counsel's performance" is "highly deferential" as there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. This inquiry "will often include an analysis of whether there could have been a sound strategic reason for counsel's actions." *State v. Scott*, 2020 UT 13, ¶ 35, 462 P.3d 350. Nevertheless, "even if a court concludes that counsel made an error, the ultimate question is always whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *Id.* ¶ 36. *See King*, 2010 UT App 396, ¶ 31 ("So long as a rational basis for counsel's performance can be articulated, we will assume counsel acted competently.") (quotation simplified).

¶30 Under the second prong, a defendant is prejudiced by defense counsel's deficient performance if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶31 Rodriguez argues that Counsel was ineffective for not moving for a directed verdict based on insufficiency of the evidence, for not objecting to Wife's reference to him serving jail time for other charges, and for not seeking a reasonable-alternative-hypothesis jury instruction. We address each claim in turn.

A.     Directed Verdict Motion

¶32 A directed verdict based on the insufficiency of the evidence is appropriate only if, when "examining all evidence in

a light most favorable to the non-moving party, there is no competent evidence that would support a verdict in the non-moving party's favor." *State v. Garcia*, 2017 UT 53, ¶ 62, 424 P.3d 171 (quotation simplified). Thus, "if the State presents no competent evidence from which a reasonable jury could find the elements of the relevant crime," trial counsel's failure to move for a directed verdict "would likely constitute deficient performance." *State v. Baer*, 2019 UT App 15, ¶ 7, 438 P.3d 979 (quotation simplified). Conversely, the trial court must deny a directed verdict motion so long as "there is any evidence, however slight or circumstantial, which tends to show guilt of the crime charged." *State v. Montoya*, 2004 UT 5, ¶ 33, 84 P.3d 1183 (quotation simplified). *See State v. Makaya*, 2020 UT App 152, ¶ 10, 476 P.3d 1025 ("A motion for a directed verdict based on insufficiency of the evidence is futile when, upon reviewing the evidence and all the inferences that can be reasonably drawn from it, a court can find that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt.") (quotation simplified), *cert. denied*, 481 P.3d 1039 (Utah 2021). In such cases, "trial counsel's decision not to raise a futile motion for a directed verdict would not be deficient performance." *Baer*, 2019 UT App 15, ¶ 7 (quotation simplified). "In examining whether a motion for directed verdict could have been granted, we view the evidence presented at trial in the light most favorable to the State." *Id.* (quotation simplified).

¶33 Rodriguez argues that Counsel performed deficiently in not moving for a directed verdict based on identity. Specifically, Rodriguez asserts that the State failed to present sufficient evidence establishing beyond a reasonable doubt that he was the burglar. In support of this argument, Rodriguez points to Husband's inability, despite seeing the burglar's face when Husband confronted the burglar in the driveway, to positively identify Rodriguez as the burglar in a photo line up; the fact that the interior of the burglarized home was not processed for forensic evidence; law enforcement's failure to investigate the

person named Tyler; and the fact that none of Husband's or Wife's possessions were found in Rodriguez's parents' house.

¶34 As an initial matter, it is "well-established that identification can be inferred from circumstantial evidence." *State v. Isom*, 2015 UT App 160, ¶ 23 n.2, 354 P.3d 791 (quotation simplified), *cert. denied*, 364 P.3d 48 (Utah 2015). And in establishing identity, "a witness need not physically point out a defendant so long as the evidence is sufficient to permit the inference that the person on trial was the person who committed the crime." *Id.* (quotation simplified). Thus, Husband's failure to positively identify Rodriguez as the burglar was not fatal to the State's case.

¶35 Moreover, ample circumstantial evidence, when viewed in the light most favorable to the State, supported the finding that Rodriguez was the burglar. The lack of other forensic evidence notwithstanding, Rodriguez was directly tied to the scene of the crime by the DNA found on the battery in the burglar's flashlight.[4] The State further linked Rodriguez, who matched Husband's description of the burglar, to the car used in the burglary, which tuned up four blocks from Rodriguez's parent's house. When retrieved, Mother's stolen car bore red paint transfer on the driver side door, which was consistent with Husband's account that the car collided with a fire hydrant while fleeing his property. And further evidence showed that Rodriguez had access to the car. That is, even without Mother's permission, Rodriguez could have

---

4. Rodriguez argues that this DNA evidence is immaterial because the burglar may have found the flashlight in the car he stole. But for purposes of a directed verdict motion, the evidence and all reasonable inferences are viewed in the light most favorable to the State. *See State v. Makaya*, 2020 UT App 152, ¶ 10, 476 P.3d 1025, *cert. denied*, 481 P.3d 1039 (Utah 2021); *State v. Baer*, 2019 UT App 15, ¶ 7, 438 P.3d 979. And the jury could reasonably infer that the flashlight containing Rodriguez's DNA belonged to Rodriguez and was used by him in the burglary.

bypassed the home's security system by climbing out his bedroom window and opening the garage door with a remote he either retrieved from Mother's bedroom or, as he claimed to Detective, kept in his own personal vehicle.

¶36 Rodriguez also contends that trial evidence supported "a hypothesis that the individual named Tyler committed the burglary and resulting theft," which "necessarily raises a reasonable doubt" as to Rodriguez's guilt. But the directed verdict standard does not look at whether evidence supporting an alternative theory exists. Rather, as stated, the focus is on whether "some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Makaya*, 2020 UT App 152, ¶ 10 (quotation simplified). "The law is well established that the existence of one or more alternate reasonable hypotheses does not necessarily prevent the jury from concluding that a defendant is guilty beyond a reasonable doubt." *State v. Darnstaedt*, 2021 UT App 19, ¶ 31, 483 P.3d 71 (quotation simplified), *cert. denied*, 496 P.3d 716 (Utah 2021). "It is the exclusive province of the jury to weigh the competing theories of the case, in light of the evidence presented and the reasonable inferences drawn therefrom, and to conclude which one they believe." *Id.* (quotation simplified). Thus, "[a]lthough it is appropriate to argue alternative inferences to the jury, such arguments would not merit a directed verdict." *Id.* And the evidence described above was indeed sufficient to withstand a directed verdict motion.

¶37 In sum, because Counsel could have reasonably concluded that a directed verdict motion would have proven unsuccessful, Counsel did not perform deficiently in forgoing such a motion. *See Makaya*, 2020 UT App 152, ¶ 9; *Baer*, 2019 UT App 15, ¶ 7. Accordingly, this claim of ineffective assistance fails.

B.     Wife's Statement

¶38 Rodriguez next argues that Counsel was ineffective for not seeking to strike Wife's statement at trial that Rodriguez "was in

jail for something else." He contends that this statement violated rule 404(b) of the Utah Rules of Evidence, *see* Utah R. Evid. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."), and that Counsel's failure to object to the statement constituted deficient performance "in light of the circumstances of this case involving the insufficiency of evidence." He also asserts that the failure to object was prejudicial because it "had tremendous potential . . . to improperly sway the jury."

¶39 The challenged statement was made during Counsel's cross-examination of Wife. Counsel asked whether investigators gave Wife "any kind of description" of the suspect they had in custody. Wife answered, "Maybe that [the suspect] was male." Counsel responded, "Okay. What kind of information did they give you?" It was at this point that Wife offered the statement that the investigators told her that the suspect "was in jail for something else." Counsel immediately pivoted the conversation back to the suspect's description, asking, "Okay, all right. With regard to a description of the person, anything?" And Wife responded that although Husband was brought in to view "different people" in a lineup, she did not believe they were ever offered a description of the suspect.

¶40 Wife's reference to Rodriguez being "in jail for something else" was both fleeting and unexpected. In this context, Counsel "may reasonably have believed it ill-advised to call undue attention to the unanticipated testimony" by objecting, and his decision not to acknowledge the passing statement and to instead turn the conversation back to the suspect's description "may be considered sound trial strategy." *State v. Harper*, 2006 UT App 178, ¶ 25, 136 P.3d 1261. *See State v. Hulse*, 2019 UT App 105, ¶ 40, 444 P.3d 1158 ("It is conceivable that a competent attorney would have chosen not to draw the jury's further attention to the fleeting exchange by objecting to its content."), *cert. denied*, 456 P.3d 389 (Utah 2019).

¶41 Accordingly, Counsel did not perform deficiently by not objecting to Wife's statement, and this claim of ineffective assistance also fails.

C. Reasonable-Alternative-Hypothesis Jury Instruction

¶42 Rodriguez argues that Counsel was ineffective for not requesting a reasonable-alternative-hypothesis jury instruction. He asserts that failure to do so constituted deficient performance given "the circumstances involving the insufficiency of evidence." He also contends that he was prejudiced by the lack of such an instruction because the jury was thereby precluded "from considering . . . the specific and unusual factual circumstances created by the State's refusal to investigate the potential suspect 'Tyler' and the resulting insufficiency-of-evidence conundrum."

¶43 Utah case law does not require a reasonable-alternative-hypothesis jury instruction. *See State v. Archuleta*, 2021 UT App 66, ¶ 33, 492 P.3d 801, *cert. denied*, 497 P.3d 831 (Utah 2021). To the contrary, so long as "the jury instructions clearly informed the jury of the standard of proof beyond a reasonable doubt," the jurors must "necessarily exclude all reasonable alternative hypotheses" when determining whether the evidence satisfies that high standard. *Id.* ¶ 32 (quotation simplified). And here, Rodriguez has not asserted that the beyond-a-reasonable-doubt jury instruction was in any regard deficient. Based on this established caselaw, Counsel could have reasonably concluded that an additional jury instruction was unnecessary because the jury was already adequately instructed on the controlling beyond-a-reasonable-doubt standard.

¶44 Moreover, Counsel also could have reasonably believed that an instruction highlighting law enforcement's alleged failure to investigate Tyler would have harmed Rodriguez's defense more than it would have aided it. That is, any alleged shortcoming in the investigation into Tyler was largely due to Rodriguez's refusal to provide any helpful information. Even if Rodriguez did not know Tyler's last name, he refused to provide the name or

address of his and Tyler's mutual friend who presumably could have supplied the missing information. And since, according to Rodriguez, Tyler was staying with the mutual friend, law enforcement might have even located Tyler at the friend's apartment. Based on these facts, Counsel could have reasonably believed that Rodriguez's refusal to provide helpful information regarding Tyler, who Rodriguez claimed had confessed to the burglary, would appear suspicious and create a negative impression with the jury.

¶45   Another reason Counsel may have decided against drawing further attention to Tyler via the jury instructions is that doing so would have weakened Counsel's chosen defense strategy. During closing argument, as part of his argument that the State failed to prove identity, Counsel emphasized the discrepancy between Rodriguez's height (5′10″) and Husband's estimations of the burglar's height. Husband initially told police the burglar was 5′6″ tall and he later testified at trial that the intruder was 3 to 6 inches shorter than his own 6′1″ frame— neither of which, according to Counsel, matched Rodriguez. *See supra* note 3. But the limited description Rodriguez offered of Tyler—between 5′3″ and 5′2″ and in his forties—contradicted both Husband's height and age estimations of the burglar. Accordingly, Counsel very well may have concluded that pointing a finger at Tyler, who matched Husband's descriptions even less than Rodriguez did, would be detrimental to his chosen defense.

¶46   For these reasons, Counsel did not perform deficiently by not requesting a reasonable-alternative-hypothesis jury instruction.

## II. The PSI

¶47   At the sentencing hearing, Rodriguez told the trial court that the PSI "says a whole bunch of things . . . that's incorrect." He continued, "I'd like to correct that when I was on parole, I was doing well. . . . It just makes it seem like that every time I've been

on probation or parole, I've gotten violated, which is a lie." After confirming that Counsel and the State had nothing further to add regarding Rodriguez's criticism of the PSI, the trial court sentenced Rodriguez. Rodriguez argues that the trial court erred in imposing sentence without first resolving the claimed inaccuracies in the PSI.

¶48 The Utah Code directs that "[i]f there is an alleged inaccuracy in the presentence investigation report that is not resolved by the parties and the [Utah Department of Corrections] or law enforcement agency before sentencing," then "the alleged inaccuracy shall be brought to the attention of the court at sentencing" and the court may then grant the parties "an additional 10 working days . . . to resolve the alleged inaccuracy." Utah Code Ann. § 77-18-103(5)(a)(i) (LexisNexis Supp. 2025).[5] If no extension is granted or if the parties fail to reach an agreement within that timeframe but "the court finds that there is an inaccuracy," the court must "enter a written finding as to the relevance and accuracy of the challenged portion of the presentence investigation report" and provide that finding to the Department of Corrections or law enforcement agency. *Id.* § 77-18-103(5)(a)(ii). A party's failure to raise any alleged inaccuracies in the PSI at sentencing constitutes waiver of the challenge. *See id.* § 77-18-103(5)(c).

¶49 Notably, "a defendant may not invoke the statute merely by claiming generally that the report is inaccurate." *State v. Corry*, 2024 UT App 142, ¶ 22, 558 P.3d 128. Rather, the "defendant must identify specific items of information in a presentence report that are allegedly inaccurate." *Id.* But here, Rodriguez raised no specific inaccuracy in the PSI for the court to resolve. Instead, his complaint appears to have been strictly subjective in nature. He complained, with our emphasis, that he felt he did "well" while

---

5. While renumbered since sentencing, the text of this subsection remains substantively unchanged. Accordingly, we cite the most current printed version of the Utah Code for convenience.

on supervision and that the PSI made "*it seem*" that he violated every instance of probation or parole he had been placed on. Critically, Rodriguez never disputed, either at sentencing or on appeal, the underlying record of his probation and parole violations as recounted in the PSI. Rodriguez has not asserted that any specific instance of failed supervision in the PSI was factually inaccurate or that the PSI omitted any instance of successfully completed supervision.

¶50 Accordingly, because Rodriguez offered only a generalized grievance rather than a specific factual challenge, he failed to trigger the trial court's statutory duty to resolve any alleged factual inaccuracies in the PSI.[6]

CONCLUSION

¶51 Rodriguez has not shown that Counsel performed deficiently in any of the instances of ineffective assistance of counsel he raises on appeal. The trial court also did not err in proceeding with sentencing without first resolving Rodriguez's generalized claim of inaccuracy in the PSI.

¶52 Affirmed.

————————

6. Rodriguez alternatively contends that Counsel was ineffective for not requesting that the court resolve the inaccuracies he raised. Because we hold that Rodriguez did not raise any specific inaccuracies for the trial court to resolve, this claim of ineffective assistance also fails. Counsel could have reasonably concluded that any motion to resolve non-specific inaccuracies in the PSI would have proven futile. *See State v. Torres*, 2018 UT App 113, ¶ 16, 427 P.3d 550 ("Because the decision not to pursue a futile motion is almost always a sound trial strategy, counsel's failure to make a motion that would be futile if raised does not constitute deficient performance.") (quotation simplified).