2019 UT App 71

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LORETTA RAE STEELE,
Appellant.

Opinion
No. 20170855-CA
Filed May 2, 2019

Third District Court, Salt Lake Department
The Honorable Keith A. Kelly
No. 155900375

C. Sue Crismon, Attorney for Appellant

Simarjit S. Gill and Curtis M. Tuttle, Attorneys
for Appellee

JUDGE DIANA HAGEN authored this Opinion, in which
JUDGES KATE APPLEBY and RYAN M. HARRIS concurred.

HAGEN, Judge:

¶1 Loretta Rae Steele was convicted of driving under the influence and leaving the scene of an accident. At trial, after the jury had been empaneled, Steele moved to dismiss the case, claiming that the State's failure to preserve a recording of a 911 call made at the time of the accident (the 911 recording) violated her due process rights. The district court denied the motion, concluding that Steele did not establish that she was prejudiced by the destruction of the 911 recording. Steele was ultimately convicted by a jury and now appeals, challenging the denial of her motion to dismiss. We conclude Steele has not made the necessary threshold showing of a reasonable probability that the 911 recording contained exculpatory evidence. Accordingly, we affirm.

BACKGROUND

¶2    At around 9:00 p.m. on the night of the accident, a woman (the eyewitness) was about to enter her apartment building when she heard a vehicle crash into a parked car. The eyewitness walked toward the SUV that caused the crash and asked if anyone needed medical assistance. The driver, a woman, got partway out of the SUV to inspect the damage, allowing the eyewitness to see the driver "from her waist up." The driver "demanded" the eyewitness help her separate the vehicles. The eyewitness refused. The eyewitness asked again if anyone needed medical assistance, but the driver merely repeated her demand for help separating the vehicles. The eyewitness ignored the request and called 911.

¶3    While the eyewitness called 911, the SUV's three passengers—a man, a woman, and a child—got out and walked away from the scene. The eyewitness was certain that at least one of the passengers exited from the passenger side of the SUV, but she was not certain if all passengers had exited from that side. The driver stayed behind and attempted to start the SUV and separate the vehicles by herself. When her attempts failed, the driver walked away in the same direction as the passengers who had already left.

¶4    While the eyewitness was on the phone with 911 dispatch, she kept an eye on the SUV and all of its occupants. Within five minutes of the 911 call, an officer arrived at the scene. The eyewitness told the responding officer that the driver of the SUV was a Native American woman, was wearing a black-and-white-striped shirt, appeared intoxicated, and left on foot.

¶5    The responding officer and his police dog have special training in tracking people fleeing on foot. After the officer had his dog smell around the SUV and inside the driver's side of the

passenger compartment, the dog tracked the scent and led the officer to a woman who was wearing a black-and-white-striped shirt and otherwise matched the eyewitness's description. The woman identified herself as Loretta Steele.

¶6 The officer walked Steele back to the scene of the accident and noticed she "[had] a hard time walking," her speech was "slurred," and she had "glassy, glazed eyes."[1] Still at the scene, the eyewitness confirmed to the officer that Steele was the driver of the SUV. During the search incident to the arrest, the officer found the keys to the SUV in Steele's possession. The passengers were not located.

¶7 The State charged Steele with driving under the influence and leaving the scene of an accident involving property damage. Almost two years later, the case went to a jury trial. After the jury had been empaneled, defense counsel moved to dismiss the case based on an alleged due process violation that resulted from the State's failure to preserve the 911 recording of the eyewitness's call to dispatch. Defense counsel explained that she had discovered only the week before that the 911 recording requested during discovery had yet to be disclosed. Two days before trial, she was informed that the recording was destroyed in accordance with the standard one-year record retention policy for recordings of 911 calls. The day before trial, the State sent defense counsel a computer-aided dispatch report (the report) made by the dispatcher who answered the eyewitness's call. In the report, there was no description of the SUV's occupants, other than noting the gender of the adults and the presence of a child. The report also provided the time the eyewitness called dispatch and the time the responding officer arrived on the scene, which was within five minutes of the call being placed.

---

1. At trial, defense counsel stipulated that Steele was intoxicated.

¶8 Given the destruction of the recording, the State and defense counsel agreed not to question the eyewitness about what she told dispatch when she called 911. The parties had informed the district court of the stipulation before jury selection, and the court had already entered an order in limine excluding that evidence. In making her oral motion to dismiss after the jury was empaneled, defense counsel explained that she was experiencing "angst about [her] stipulation." On reconsideration, she believed dismissal was a more appropriate remedy and wished to withdraw the stipulation.

¶9 Defense counsel asserted that the 911 recording was exculpatory because it "allegedly contained a description of the driver . . . [and we] don't know if that description actually conformed with [Steele's appearance] or not." Defense counsel argued that, under *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, there was a reasonable likelihood that the 911 recording contained exculpatory evidence; that the State was culpable in failing to preserve it; and that, without it, Steele could not present her defense.

¶10 The court denied Steele's request to withdraw the stipulation. In light of the arguments presented, the report, and the parties' stipulation to avoid asking the eyewitness about the details she might or might not have provided to dispatch, the district court denied Steele's motion to dismiss, focusing largely on the lack of prejudice. It explained that "if [the eyewitness] gave a description to the [911] operator, and we don't know if she did or not, . . . the officer shows up just a matter of minutes later and she gives a description again. It would seem . . . to be unlikely that a different description is given." The court also explained that the eyewitness, who would testify at trial, gave the officer a description of what she saw and there "appear[ed] to be no reason why that eyewitness . . . would say something different to a [911] dispatcher one minute and a few minutes later would say something different to a police officer."

¶11 At trial, defense counsel's opening statement suggested to the jury that the other female occupant of the SUV was actually the driver, not Steele. As trial progressed, defense counsel developed this theory. She first attempted to discredit the eyewitness's identification of Steele on cross-examination by asking the eyewitness numerous times to provide descriptions of the other SUV passengers, but the eyewitness could not provide anything other than their race, gender, and that there was a child present. Defense counsel further sought to discredit the eyewitness's identification of Steele by providing testimony from an eyewitness identification expert. The expert testified to the stages of memory; how memory can be affected by distractions, stressors, and the suggestibility of "show ups"[2]; and the phenomenon of "change blindness."[3] But the jury rejected the defense's theory and convicted Steele of both charges.

¶12 Steele appeals the denial of her motion to dismiss.

## ISSUE AND STANDARDS OF REVIEW

¶13 Steele contends the district court erroneously denied her motion to dismiss, arguing that her right to a fair trial was violated because the State destroyed exculpatory evidence. Steele's contention presents a mixed question of law and fact.

---

2. A "show up" is when an eyewitness identifies a suspect in a "single-suspect showup rather than a multi-suspect lineup." *See State v. King*, 2017 UT App 43, ¶ 28 n.4, 392 P.3d 997.

3. "Change blindness" is an individual's "failure to notice even substantial changes in objects or scenes[] when [his or her] attention is otherwise engaged." Jennifer K. Robbennolt, *Apologies and Reasonableness: Some Implications of Psychology for Torts*, 59 DePaul L. Rev. 489, 504 (2010).

*State v. Mohamud*, 2017 UT 23, ¶ 10, 395 P.3d 133. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness, though we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *State v. DeJesus*, 2017 UT 22, ¶ 18, 395 P.3d 111 (quotation simplified).

ANALYSIS

¶14 Steele asserts that the 911 recording "likely recorded [the] eyewitness's first description of the driver," which she contends might have been different from the description given to the officer when he arrived on the scene. Because such evidence might have been exculpatory, she argues that the State's failure to preserve that recording "violated [her] due process right to a fundamentally fair trial."

¶15 To determine whether "the State's destruction of potentially exculpatory evidence violates due process," the Utah Supreme Court has established a threshold requirement that is followed by a balancing test. *State v. DeJesus*, 2017 UT 22, ¶¶ 18, 27, 395 P.3d 111. First, under *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, "the defendant must demonstrate a reasonable probability that the lost evidence would have been exculpatory." *DeJesus*, 2017 UT 22, ¶ 27; *see also Tiedemann*, 2007 UT 49, ¶ 44. This threshold showing "will be met so long as the defendant's proffer as to what the lost [or destroyed] evidence would have shown is not pure speculation or wholly incredible." *State v. Mohamud*, 2017 UT 23, ¶ 20, 395 P.3d 133 (quotation simplified). Once this threshold has been satisfied, the district court must "determine the seriousness of the due process violation and fashion the appropriate remedy" by balancing both: "(1) the culpability of the State in the loss or destruction of the evidence and (2) the prejudice to the defendant as a result of the missing evidence." *Id.* ¶ 18.

¶16    The district court's determination that Steele could not establish prejudice appears to assume, without deciding, that Steele could meet the threshold requirement by demonstrating a reasonable probability that the 911 recording would have been exculpatory. On appeal from the denial of a motion to dismiss, we may affirm on any basis apparent in the record. *See Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 (explaining that we "may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record" even if "such ground or theory . . . was not considered or passed on by the lower court" (quotation simplified)). We conclude Steele has not satisfied the threshold requirement and therefore do not address whether the court correctly balanced the culpability of the State in the destruction of the evidence against the prejudice to Steele.

¶17    In *DeJesus*, the Utah Supreme Court clarified "what constitutes a reasonable probability for purposes of a defendant's due process right to exculpatory evidence." 2017 UT 22, ¶ 39. The court explained that "a reasonable probability standard defies a precise definition or quantifiable value" and "though it is more than a mere possibility, it falls substantially short of the more probable than not standard." *Id.* (quotation simplified). Ultimately, the defendant must establish "a probability sufficient to undermine confidence in the outcome" of the case. *Id.* (quotation simplified). In applying that standard to the defendant's case in *DeJesus*, the court concluded that the defendant had satisfied the threshold showing of a reasonable probability that the destroyed evidence would have been exculpatory. *Id.* ¶ 41.

¶18    In *DeJesus*, the defendant was charged with assaulting a correctional officer after an altercation broke out between the defendant and another inmate in a prison cell. *Id.* ¶¶ 4–5. The correctional officer intervened in the altercation and after he pushed the defendant to the ground, the defendant kicked the officer twice, "once in the abdomen and once in the thigh." *Id.*

¶ 4. The prison had a video recording of the altercation and assault, but the video was destroyed before the investigating officer could review it and before it could be turned over to the defense. *Id.* ¶¶ 4–6. The defendant moved to dismiss the assault charge under *Tiedemann*, "claiming that the loss or destruction of the [video recording] constituted a due process violation" because the video recording would have shown that "if she kicked [the officer], she did so unintentionally, merely seeking to defend herself from" the other inmate. *Id.* ¶ 9.

¶19    At the evidentiary hearing on the motion to dismiss, the defendant provided testimony from her fiancée, a fellow inmate, who explained that the defendant, the officer, and the other inmate were all on the ground at the time of the assault and that the other inmate remained on the officer's back while the defendant kicked at her, striking the officer by accident. *Id.* ¶¶ 12, 41. The court determined the fiancée was not credible because she was biased. *Id.* ¶ 14. The State elicited testimony from the officer, who at first said that the inmate fighting with the defendant was six feet behind him when the defendant kicked him, but on cross-examination the officer said the other inmate "was on his back." *Id.* ¶ 11 (quotation simplified). The officer attempted to clarify that he "did not know precisely where" the other inmate was standing but after he had reviewed the video recording—prior to its destruction—"he could see that [the other inmate] was standing four to six feet behind him." *Id.* ¶¶ 5, 11 (quotation simplified). The district court denied the defendant's motion to dismiss, and the defendant appealed. *Id.* ¶ 17.

¶20    On appeal, our supreme court determined that the testimony of the defendant's fiancée that contradicted the "arguably inconsistent testimony of" the officer was "sufficient to establish a reasonable probability that the lost [video recording] would have been exculpatory." *Id.* ¶ 44. The court explained that the testimony of the fiancée and the officer, when

taken together, "provide[d] a reasonably probable explanation of both what the lost evidence might have shown and how that evidence could have benefitted [the defendant]." *Id.* Under these facts, the court concluded that the threshold showing was satisfied.

¶21    By contrast, in *State v. Mohamud*, 2017 UT 23, 395 P.3d 133, an opinion issued the same day as *DeJesus*, our supreme court held that another defendant challenging the destruction of a prison video recording had not satisfied the threshold showing. In *Mohamud*, the defendant "was charged with one count of possessing a prohibited item in a correctional facility" after a correctional officer discovered a shank on the defendant's person while transporting the defendant from one cell to another. *Id.* ¶¶ 2–5. The defendant "submitted a discovery request seeking all video recordings of the event" and learned that the surveillance video, if one existed, had been destroyed before the charges were filed, pursuant to the facility's thirty-day retention policy. *Id.* ¶¶ 4–5.

¶22    The defendant moved to dismiss, arguing that "a video recording of the incident would have been exculpatory because it could have impeached the testimony of the officers, though he provided no further details as to what specific testimony would have been impeached." *Id.* ¶ 6. The only evidence before the district court regarding what the surveillance video could or would have contained came from the investigating officer who testified that the surveillance cameras "generally record and are on" and "they possibly could have recorded the incident, [but] he did not know if those cameras were actually recording that day, he never viewed any recordings for [the date in question], and he had no knowledge whether or not there was an actual recording made." *Id.* ¶ 7 (quotation simplified). The district court found "that there [was] not even evidence that there was a videotape. There may have been a videotape. There is no evidence the cameras were on or [whether] they were off at the

time, nothing to indicate what the camera would have [recorded]." *Id.* ¶ 8 (quotation simplified). The district court denied the motion to dismiss, and the defendant appealed. *Id.* ¶¶ 8–9.

¶23 On appeal, the Utah Supreme Court held that the district court correctly denied the motion to dismiss, concluding that the defendant did not satisfy the threshold showing under *Tiedemann* that there was a reasonable probability that the surveillance video would have contained exculpatory evidence. *Mohamud*, 2017 UT 23, ¶ 19. Even assuming "that the alleged video footage both existed and captured the incident at issue," the court held that the defendant did not establish a "reasonable probability that it would have been exculpatory." *Id.* Instead, the defendant "proffered only speculation as to what the footage might have shown." *Id.* The defendant stated that the "video evidence would have contradicted, discredited or called the correctional officers' memory into question in some way," but he "provide[d] no description, testimony, or other evidence establishing what the video would have shown and how that would have impeached the officers' testimony." *Id.* ¶ 22 (quotation simplified). While "[i]t is certainly true that a video recording of the incident would have been highly probative of what truly happened," the court explained that "simply stating that video recordings can be helpful to determine truth does not establish that this particular video recording would have been helpful to [the defendant] in the specific circumstances of his case." *Id.* ¶ 21.

¶24 The court explained that the defendant could have made a threshold showing that the destroyed evidence had a reasonable probability of being exculpatory "by offering the testimony of other inmates who witnessed the event" or he "could have testified on his own behalf as to what the video would have shown, which would not have waived his Fifth Amendment right against self-incrimination." *Id.* ¶ 23. But "a

defendant cannot rest on the claim that the evidence could have undermined confidence in a witness's testimony in some possible way, but must instead make some proffer as to what testimony would have been contradicted and how such a contradiction would have aided the defendant." *Id.* ¶ 22. "Although the showing required of defendants is low, there must be something more than speculation about how the evidence could conceivably be exculpatory," and the defendant offered only "speculation about potential impeachment." *Id.* ¶ 24.

¶25 Like the defendant in *Mohamud*, Steele has not satisfied the threshold requirement under *Tiedemann* of showing a reasonable probability that the 911 recording would have contained exculpatory evidence. Steele did not provide any evidence that the eyewitness gave a description of the driver to dispatch when she called 911, much less that the description would contradict the eyewitness's testimony. Instead, she claims only that the 911 recording "very well may include" details about the other female passenger. The only evidence to support this assertion was the officer's statement that dispatch usually asks callers for a description of the suspects. Just as in *Mohamud*, where the investigator explained that cameras at the facility "generally record and are on" but could not say whether "those cameras were actually recording that day" or whether they would have recorded the incident, *see* 2017 UT 23, ¶ 7 (quotation simplified), whether the eyewitness gave dispatch a description of the driver in this case is purely speculative. Indeed, the only evidence as to what occurred during this particular call suggests that no such description was given. The dispatch notes contained no description of the SUV's occupants other than the gender of the adults and the presence of a child. Moreover, at trial, the officer never testified that he was given a description of the SUV's occupants from dispatch; he recounted only the description of the driver he received from the eyewitness when he arrived on scene.

¶26 Significantly, in arguing her motion to dismiss, Steele never asked to present any evidence outside the presence of the jury as to whether the eyewitness gave a description to dispatch that would have been captured on the recording.[4] Unlike the defendant in *DeJesus*, who elicited testimony from eyewitnesses about what the video recording would show, 2017 UT 22, ¶ 45, Steele never asked to present testimony from the eyewitness or other witnesses who could have testified as to what description, if any, the eyewitness gave to dispatch during the 911 call.[5] Nor did Steele offer her own testimony[6] or that of the other occupants of the SUV to support the idea that the eyewitness might have confused her with the other female occupant, such as evidence that their clothing was similar or that Steele switched places with the driver after the eyewitness called 911. Thus, even if we were to assume that the eyewitness described the driver to dispatch, we must further assume that the description given to dispatch was inconsistent with the eyewitness's testimony at trial in order to conclude that there is a reasonable probability

---

4. At oral argument on appeal, Steele argued that even "the absence of a description" on the 911 recording could be exculpatory. Steele has not explained how the absence of a description of Steele and the other female passenger supports the defense's theory that the 911 recording contained exculpatory evidence of misidentification.

5. The court's order accepting the parties' stipulation to refrain from asking the eyewitness such questions at trial would not have precluded the admission of that evidence outside the presence of the jury in support of the motion to dismiss.

6. In doing so, Steele "would not have waived [her] Fifth Amendment right against self-incrimination." *State v. Mohamud*, 2017 UT 23, ¶ 23, 395 P.3d 133.

that the recording was exculpatory. There is no actual evidence in this case to support either assumption.

¶27 We note that any lost or destroyed evidence—including the evidence here—has the potential to contain exculpatory evidence. Although the threshold reasonable probability standard presents a low bar, a defendant must provide "more than speculation," *Mohamud*, 2017 UT 23, ¶ 20 (quotation simplified), and present some evidence that would explain "both what the lost evidence might have shown and how that evidence could have benefitted [the defendant]," *DeJesus*, 2017 UT 22, ¶¶ 39, 44. Here, Steele has not established a reasonable probability that the 911 recording included a description of the driver, much less one that would have assisted her in impeaching the eyewitness's testimony at trial.

CONCLUSION

¶28 Because Steele did not demonstrate a reasonable probability that the lost evidence would have been exculpatory, we affirm the district court's denial of her motion to dismiss.

———————