2025 UT App 22

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JONATHAN ISAAC DEW,
Appellant.

Opinion
No. 20220463-CA
Filed February 21, 2025

Second District Court, Farmington Department
The Honorable Michael D. DiReda
No. 181702104

Gregory W. Stevens, Emily Adams, and Hannah
Leavitt-Howell, Attorneys for Appellant

Derek E. Brown and David A. Simpson,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

LUTHY, Judge:

¶1 Jonathan Isaac Dew was convicted of thirteen counts of sexual exploitation of a minor. He challenges his convictions by arguing that (1) his due process rights were violated by the State's loss or destruction of evidence, (2) the evidence was insufficient to support his convictions, (3) the district court plainly erred by failing to sua sponte strike statements made by the prosecutor during closing argument, and (4) his trial counsel (Counsel) provided ineffective assistance by not objecting to those statements. We disagree on all fronts and affirm Dew's convictions.

## BACKGROUND[1]

### *Investigation*

¶2      In October 2018, an agent (Agent) working for the Internet Crimes Against Children task force (ICAC) was alerted that a particular IP address had connected to an online peer-to-peer file-sharing network and that someone at the IP address had offered to distribute files of child pornography. Agent downloaded the offered files and confirmed that they contained videos of child pornography. Agent then obtained and served on the internet service provider a court order to identify the name and street address of the subscriber associated with that IP address. The provider's response indicated that the subscriber was Dew's wife (Wife) and that the associated street address was that of Dew and Wife's home. Agent then obtained and—along with other ICAC agents—executed a warrant to search the home. Wife was home when the agents executed the warrant; Dew was not.

¶3      The IP address that had shared the child pornography videos was assigned to an internet router in the home. Thus, while the agents knew that the videos had come from a device that had been logged onto the home's network, they did not know which device had been used to share the files.

¶4      While executing the warrant, the agents found multiple electronic devices and conducted or attempted to conduct an on-site "forensic preview" of each device. This "triage" procedure enabled the agents to determine which devices could be "rule[d] out as not being involved" and which devices to seize for a full "forensic examination" "at a laboratory that's dedicated for that purpose."

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Gallegos*, 2020 UT 19, n.1, 463 P.3d 641 (cleaned up).

¶5     Among the devices found in the home were a laptop computer, a desktop computer, and a cellphone identified by Wife as her devices or devices she regularly used. She provided the agents with the passwords for those devices, thereby enabling the agents to conduct forensic previews of the devices. Based on those previews, the agents determined that no further investigation was warranted of those devices.

¶6     The agents also found a number of devices that belonged to Dew, including an external hard drive and multiple mobile devices, that were encrypted with passwords. The encryption on these devices prevented the agents from conducting forensic previews of them, so the agents seized these devices for analysis at the lab. Even at the lab, however, analysts were unable to conduct a forensic analysis of these devices because they were never able to "obtain any passwords to any [of] . . . Dew's devices."

¶7     In a basement "poker room," the agents found two laptop computers—one black and one silver—that Wife identified as either belonging to Dew or as having been used exclusively by him. Agent conducted an on-site forensic preview of the silver laptop's hard drive. That preview generated "a registry report contain[ing] a list of the files that [had] been recently opened [on] that computer." The list included "file names [that] were indicative . . . of child pornography." Accordingly, the agents seized the silver laptop for further investigation. But when they later tried to conduct a full forensic analysis of the silver laptop's hard drive, the analysts "could not get it . . . to spin" and were therefore unable to conduct additional analysis.

¶8     The agents attempted to conduct an on-site forensic preview of the black laptop as well, but they were prevented from doing so because it was encrypted and Wife said "that she did not have the password." Thus, the agents seized the black laptop for a full forensic analysis. At the lab, despite "some degree of

encryption" on the black laptop, an analyst (Analyst) was able to view "a good portion" of its contents. The portion of its contents that Analyst was able to view contained images of child pornography, which Analyst described as "thumbcache files" (or "thumbnail[s]") and "carved images." It also contained "link files" and "shellbags" indicating that additional images of child pornography had also been on the laptop. Most of the link files and shellbags had been created and accessed during the middle of the night.

¶9     Based on the foregoing investigation, the State charged Dew with seventeen counts of sexual exploitation of a minor for "knowingly possess[ing] . . . child sexual abuse material." Utah Code § 76-5b-201. Counts 1 through 4 were based on the videos shared through the peer-to-peer network. Counts 5 through 17 were based on the child pornography on the black laptop.

*Motion to Dismiss*

¶10    Prior to trial, Dew filed a motion to dismiss, asserting that "destruction of evidence by the prosecution" had violated his due process rights under the Utah Constitution and the United States Constitution. Dew claimed that the ICAC agents had destroyed exculpatory evidence by returning Wife's phone to her without making a copy of its contents. That alleged evidence consisted of "text messages from [Dew] to [Wife] in which he shared . . . the password to" the black laptop. Dew argued that the messages would have shown that Wife was lying when she told the agents she did not have that password.

¶11    Dew also asserted that although the silver laptop had been "opened and viewed" by the ICAC agents when they executed the warrant, it had then been "broken and [was] no longer accessible." Dew maintained that "the destruction of the evidence on the [silver laptop,] which had child porn file names but no content[,] may have had some evidence tying it to [W]ife."

¶12    The district court denied Dew's motion. It reasoned, in part, that the alleged text messages from Dew to Wife had not been destroyed or lost. It explained that if Dew actually sent those messages, then they would still be on his device and he "can't participate in [their] concealment" by refusing to disclose the device's password "and then claim that law enforcement is responsible for losing" the messages. As to the silver laptop, the court determined, among other things, that Dew's assertion that the device "may have had some evidence tying it to [W]ife" was insufficient to demonstrate a "reasonable probability that the contents of that laptop would be exculpatory."

*Trial*

¶13    The case proceeded to trial, where Counsel, in his opening statement, cast the matter as "truly a case of whodunit." Agent, Analyst, and Wife then testified to the above-recited facts about the investigation. Wife further testified that she did not often use the poker room but that Dew would spend about five hours a day there "gam[ing]," "play[ing] on his computer," and "watch[ing] porn." She explained that Dew worked four ten-hour days—from "noon to 10:00 [p.m.]"—each week and that at night he slept in a basement family room near the poker room. The master bedroom was upstairs.

¶14    Wife stated that she had no sexual interest in children, was unfamiliar with the peer-to-peer file sharing network through which Agent had received the child pornography videos, and had never downloaded child pornography.

¶15    Wife was asked about the silver laptop and the black laptop. She explained that the silver laptop had been her sister's when her sister was in high school, that it was subsequently "given to [Wife and Dew] by [Wife's] stepdad," that she had not known where it was before the agents found it, and that she had never used it. Regarding the black laptop, Wife testified that she and Dew "got [it] under a payment plan" and "were still paying

on it" when the agents executed the warrant. She stated that she had used the black laptop only once and that was "to connect to the modem downstairs to fix the Wi-Fi." When asked about her purported statement to ICAC agents that she had "not ever access[ed]" the black laptop, Wife said that her one-time use of the black laptop was "just something that came to memory later"; that she remembered the agents asking her "what [Dew's] password was"; and that "all [she] could remember was that it started with delta," which was "not his full password."

¶16    Analyst testified about the files he found on the black laptop. He stated that he recovered thirteen still images of child pornography and that all but two of those images were stored as "thumbcache files." He explained that a thumbcache file is "a pointer . . . for a file that existed on [a] device," and that it is "a smaller rendition of an image" that a computer's "operating system generates" to help load the original image faster. Analyst said that one way for a thumbcache file to be created is for the user to open the original image. Analyst also testified that a thumbcache file is not created unless the original image existed on the computer at some point. The thumbcache images here were unaccompanied by various metadata, such as information about when the images were created, last modified, or accessed. Analyst testified that this lack of metadata could be the result of the underlying files having been partially overwritten or the metadata having been deleted.

¶17    Analyst testified that the last two images of child pornography found on the black laptop were "carved images." A carved image is an image file that was "once deleted" but has been forensically recovered.

¶18    Analyst found additional evidence of child pornography on the black laptop in the form of "link files" and "shellbags." He stated that a link file "is essentially a shortcut . . . that points the operating system [of a computer] to a file that

was on . . . the computer at that time." Analyst explained that a link file may be created by the user of the device or by the device itself, but that it can be created only for a file that was actually on the computer. A list of link files extracted from the black laptop included references to a particular and distinctive name that is associated with a widely circulated collection of child pornography.

¶19 Analyst testified that a shellbag is created when a user of a Windows device opens a folder. The shellbag creates a record of which folder was opened, correlates that record to a particular user, and then uses that information to customize that user's experience. For example, if the user always moves a particular folder to the side of the screen after opening it, the shellbag will remember that movement and tell the operating system to open the folder on the side of the screen in the future. Analyst explained that the existence of a shellbag does not necessarily mean that a particular folder is still on the computer, but it does mean that the folder existed either on the computer or on an attached external hard drive at some point and that a particular user directly interacted with it.

¶20 Analyst was able to extract seventeen pages of shellbag records from the black laptop. All of the shellbags were created for a password-protected account with the username "Jon" (a shortened version of Dew's first name, Jonathan); there was no corresponding username for Wife. The shellbag records included multiple additional references to the well-known child pornography series as well as references to numerous other directory paths with suspicious names, such as "child models-girls," "kidfetish," and "for-childporn." Many of the suspicious link files and shellbags were created between the hours of 11:00 p.m. and 5:00 a.m.—times consistent with Dew's swing-shift work schedule.

*Motion for a Directed Verdict*

¶21 After the State rested, Dew moved for a directed verdict on all of the charges. Regarding counts 1 through 4, he argued that the evidence was insufficient to convict him because no evidence of the child pornography videos shared from Wife's IP address had been found on the devices analyzed at the lab. As to the remaining counts, he contended, "[Because] the State's evidence cannot identify when the evidence presented occurred, . . . the State cannot prove beyond a reasonable doubt that these actions took place within . . . the applicable statute of limitations."[2] The court denied the motion, noting that "[w]hile this may be a case of circumstantial evidence," there was sufficient evidence from which "a reasonable jury could see [the case] . . . the way that the State ha[d] advanced."

*Closing Arguments and Conviction*

¶22 At the conclusion of trial, the parties presented closing arguments. The prosecutor summarized the evidence against Dew, highlighting that someone from the IP address associated with Dew and Wife's home used a peer-to-peer file sharing network to distribute child pornography, that the silver laptop and black laptop were found in the poker room that Dew regularly used (and that Wife did not), that various images of child pornography were found on the black laptop, that the username on that laptop was "Jon," and that Wife testified that both laptops were used almost exclusively by Dew. The prosecutor then stated:

> Now, at the end of the day, there's a why to all of this. I don't know about motive. Frankly, I don't care about motive. . . . I care about why. Why

---

2. Dew's arguments regarding counts 16 and 17 were less than clear, but they at least included the statute of limitations argument he made as to counts 5 through 15.

you're here. Why is this case important? Why can't any of this simply get on the stand and tell you it's the defendant . . . that passed these pictures around?

The kids in these pictures can't speak. They can't call for help. The people out there to help them are [the ICAC agents]. Those are the people out there to speak for them. They speak for them by giving them these. Because those . . . kids can't speak. Can't call for help.

Why this is important is because those aren't just images. Those aren't just videos. Those are kids. And they are being traded like baseball cards. That's why.

But you don't convict somebody because of that why. I'm not asking you to convict [Dew] because of that. That's why this is important. I'm asking you to convict [Dew] because [the ICAC agents and Wife] have spoken for those children, and they are telling you what they're saying. This evidence, those images, where they were found, the computers they were on, that is them talking.

¶23   In response, Counsel began his closing argument by saying, "I'm cognizant of the fact that a crime was committed. And I don't want to detract from that. No question, child pornography is horrible. No question that we all believe that child pornography is horrible. But don't let that cloud your vision as to determining who did it." Later, he again acknowledged that child pornography "is a horrible and brutal thing." Counsel's remaining arguments focused on the State's burden of proof and on asserting that the evidence created reasonable doubt regarding who knowingly possessed the child pornography on the black laptop.

¶24 The jury acquitted Dew of counts 1 through 4 (the ones based on the videos shared over the peer-to-peer network) but found him guilty of counts 5 through 17 (the ones based on the images found on the black laptop).

*Motion to Arrest Judgment*

¶25 Dew then filed a motion to arrest judgment, again asserting that there was insufficient evidence to convict him. He argued that "the State failed to prove that [he] was the user of the computer in question beyond a reasonable doubt because the evidence presented was simply an opinion of the officers based on statements by [Wife] that the computer . . . was [Dew's]." "The problem with the evidence," Dew continued, was that the ICAC agents "told [Wife] they were investigating child pornography[] and then had her identify which electronic devices were hers and which were [Dew's]." Dew then summarized the "questionable" and "contradictory" testimony that had been offered at trial. The district court denied the motion to arrest judgment and sentenced Dew to prison.

ISSUES AND STANDARDS OF REVIEW

¶26 Dew now appeals, raising four issues for our review. First, he challenges the district court's denial of his pretrial motion to dismiss, which asserted that the State violated his due process rights by destroying evidence. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness, though we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations." *State v. DeJesus*, 2017 UT 22, ¶ 18, 395 P.3d 111 (cleaned up).

¶27 Next, Dew argues that the district court erred when it denied his motions for a directed verdict and to arrest judgment, each of which challenged the sufficiency of the evidence. "We

review a district court's grant or denial of a motion for directed verdict and to arrest judgment for correctness." *State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251. A defendant appealing the denial of a motion for directed verdict or to arrest judgment "has a substantial burden on appeal." *Id.* (cleaned up). He or she "must show that, when viewed in the light most favorable to the State, *no evidence existed* from which a reasonable jury could find beyond a reasonable doubt that the defendant committed the crime." *Id.* (cleaned up).

¶28 Finally, Dew contends that the district court plainly erred by not sua sponte striking statements made by the prosecutor during closing argument. He relatedly asserts that Counsel provided ineffective assistance by failing to object to the same statements. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Elkface*, 2023 UT App 24, ¶ 7, 527 P.3d 820 (cleaned up), *cert. denied*, 534 P.3d 752 (Utah 2023). Because a claim of plain error also involves no lower court ruling, we decide the claim in the first instance as a matter of law. *See State v. Corry*, 2024 UT App 142, ¶ 17, 558 P.3d 128.

ANALYSIS

I. Due Process

¶29 Dew contends that the district court erred by denying his motion to dismiss, which was based on the assertion that the State violated his due process rights under the Utah Constitution by failing "to preserve a copy of Wife's phone" and by causing "the

silver laptop [to stop] working while in the State's possession."[3] We see no error in the district court's decision.

¶30    In *State v. Tiedemann*, 2007 UT 49, 162 P.3d 1106, our supreme court held that to establish a violation of due process rights under the Utah Constitution based on the State's loss or destruction of evidence, a defendant must first demonstrate "a reasonable probability that lost or destroyed evidence would be exculpatory." *Id.* ¶ 44 (cleaned up). If the defendant makes that threshold showing, the court must then weigh two factors:

> (1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.

*Id.* "In reviewing the district court's decision on this matter, . . . we accept its factual determinations unless [they are] clearly erroneous." *State v. DeJesus*, 2017 UT 22, ¶ 38, 395 P.3d 111. "But the district court's determination of what constitutes a reasonable probability for purposes of [this] analysis is a legal question reviewed for correctness." *Id.*

A.    Wife's Phone

¶31    Dew contends that the State violated his due process rights under *Tiedemann* by failing "to preserve a copy of Wife's phone." He asserts that if such a copy had been made and preserved, it "would show a text where [Dew] shared his passwords with Wife" and this text would have "directly contradicted Wife's

---

3. While Dew argued in the district court for dismissal under both the Utah Constitution and the United States Constitution, he bases his argument on appeal solely on the Utah Constitution.

police statements that she did not know the passwords to [Dew's] devices." But Dew has not demonstrated that *Tiedemann* is applicable in this scenario. On this point, *State v. Powell*, 2020 UT App 63, 463 P.3d 705, is instructive.

¶32     In *Powell*, the defendant was convicted of lewdness after he went into two separate stores "in his wheelchair with his genitals exposed." *Id.* ¶ 2. Approximately nine months after receiving a report of these incidents, a detective "sought surveillance videos from both stores." *Id.* ¶ 4. "While the second store still had surveillance footage from the night in question, the first store did not; by that time, it had already recorded over it." *Id.* The detective "viewed the video footage from the second store and was able to identify [the defendant] and to partially track his movements through the store, but [he] never found any footage of [the defendant] exposing himself." *Id.* (cleaned up). On appeal to this court, the defendant claimed that his counsel had rendered ineffective assistance by not moving to dismiss under *Tiedemann* "due to the lost or destroyed video surveillance from both stores." *Id.* ¶ 50.

¶33     In response, we noted that "[a]s to the second store, [the defendant had] direct[ed] us to no place in the record suggesting the video surveillance [had been] lost or destroyed." *Id.* ¶ 53. We further observed, as to both stores, that under *Tiedemann*, "criminal defendants are entitled to information *possessed by the State* to aid in their defense" and that the defendant had "not shown that the *Tiedemann* test applies in situations where a private party, not the State, controls the maintenance and preservation of the potential evidence." *Id.* ¶¶ 51, 54 (cleaned up). Finally, we noted that "to the extent [the defendant was] fault[ing] the police for not taking immediate efforts to collect the video surveillance, he [had] not directed us to any authority suggesting that *Tiedemann* and its progeny may be read to impose on police an obligation to 'immediately' make an 'initial quick' investigation upon receiving any report of crime, with the aim of

preserving any potential evidence before any legal theories have been identified." *Id.* ¶ 55. For these reasons, we concluded that the defendant had "not demonstrated that his trial counsel performed deficiently by not moving for dismissal due to the unavailable video surveillance." *Id.* ¶ 57.

¶34 Dew's *Tiedemann* argument suffers from deficiencies similar to those that were present in *Powell*. First, Dew has directed us to no place in the record suggesting that Wife's phone or the text messages on it were lost or destroyed, and he could have subpoenaed the phone if he had wished to demonstrate that they were, *see* Utah R. Crim. P. 14(a)(2) ("A subpoena may command the person to whom it is directed to . . . allow inspection of records, papers or other objects . . . ."). Dew also has not shown—or made any effort to show—that the *Tiedemann* test applies in situations where a private party, like Wife, controls the maintenance and preservation of the potential evidence at issue. Nor has Dew directed us to any authority suggesting that *Tiedemann* and its progeny may be read to impose on law enforcement agents an obligation to retain every item they may be authorized by warrant to seize even if such items have no apparent inculpatory or exculpatory value at the time the warrant is executed. For these reasons, we affirm the district court's denial of Dew's motion to dismiss to the extent that the motion was based on the asserted loss or destruction of Wife's phone or the messages on it.[4]

---

4. Like the district court, we recognize that Dew's phone is in State custody and that if Dew sent the black laptop's password to Wife by text message, then that message should be on Dew's phone and could be made available if Dew disclosed the password to the phone. However, Dew argues that resolving the *Tiedemann* issue on that basis would violate his Fifth Amendment right against compelled self-incrimination. Because "judicial restraint counsels

(continued…)

B.      The Silver Laptop

¶35     The other basis for Dew's motion to dismiss was that the silver laptop was effectively lost or destroyed when its hard drive ceased to function. As to this basis for dismissal, the district court concluded that Dew had not demonstrated a reasonable probability that the silver laptop contained exculpatory evidence. We agree.

¶36     The *Tiedemann* analysis includes "a threshold reasonable probability requirement." *State v. DeJesus*, 2017 UT 22, ¶ 2, 395 P.3d 111. "In order to satisfy the reasonable probability standard in the lost evidence context, a defendant must make some proffer as to the lost evidence and its claimed benefit. So long as that proffer is not pure speculation or wholly incredible, the standard will be satisfied." *Id.* ¶ 39 (cleaned up); *see also State v. Steele*, 2019 UT App 71, ¶ 27, 442 P.3d 1204 ("Although the threshold reasonable probability standard presents a low bar, a defendant must provide more than speculation . . . ." (cleaned up)).

¶37     Dew argues that he met this "minimum showing" by indicating to the district court that (1) "the dates of the files on the silver laptop occurred prior to his possession of the laptop" and (2) "Wife's laptop showed downloads of . . . the [peer-to-peer filing sharing network] used to exchange child pornography." But neither of these facts show that there is a reasonable probability that the silver laptop contained exculpatory evidence as to Dew.

¶38     As an initial matter, we note that the record contains no findings by the district court regarding these facts. Thus, for our analysis here, we rely on the undisputed proffers at the hearing

_____

against reaching constitutional questions if we can resolve the case on non-constitutional grounds," *State v. Goins*, 2017 UT 61, ¶ 24, 423 P.3d 1236, we do not address whether the *Tiedemann* issue in this case can be resolved based on Dew's phone being in State custody without running afoul of the Fifth Amendment.

on the motion to dismiss, the undisputed evidence admitted at trial, and the fact that certain evidence was never proffered or admitted.

¶39   Dew's first assertion for why the silver laptop may have contained exculpatory evidence is that because "the dates of the files on the silver laptop occurred prior to his possession of the laptop," the silver laptop "could have shown that . . . someone else engaged in the downloads." However, the evidence Dew relies on for this assertion—the "registry report contain[ing] a list of the files that [had] been recently opened [on] that computer"— also undisputedly indicates that the silver laptop's calendar was multiple years off and that, when correlated to account for the laptop's skewed calendar, the file creation dates are actually within the time when Dew possessed the laptop. Thus, Dew's first assertion does not demonstrate a reasonable probability that the silver laptop contained exculpatory evidence.

¶40   Dew's second assertion for why the silver laptop may have contained exculpatory evidence is that because "Wife had downloaded [the peer-to-peer filing sharing network] onto her own personal laptop," the silver laptop "could have shown that Wife . . . engaged in the downloads" on that laptop as well. But based on the undisputed proffers at the hearing on the motion to dismiss (which were later matched by undisputed evidence at trial), we conclude that this amounts to the type of "pure speculation" that does not satisfy *Tiedemann*'s reasonable probability requirement. *DeJesus*, 2017 UT 22, ¶ 39.

¶41   The undisputed proffers (and later evidence) indicated that Wife had never used the silver laptop and did not know where it was until it was found by the ICAC agents. There was also undisputed evidence that Wife had no child pornography on her personal devices. If Dew had proffered evidence that Wife had used the silver laptop or that she did have child pornography (not merely the file-sharing network) on one of her devices, that

evidence likely would have satisfied *Tiedemann*'s reasonable probability requirement. One way Dew could have made such a proffer is by testifying on his own behalf to Wife's prior use of the silver laptop—a move that "would not have waived his Fifth Amendment right against self-incrimination." *State v. Mohamud*, 2017 UT 23, ¶ 23, 395 P.3d 133. By failing to make such a proffer, Dew has failed to demonstrate that there is a reasonable probability the silver laptop contained evidence that Wife had been using it. *See id.* ¶¶ 22–24 (concluding that the defendant had failed to meet *Tiedemann*'s reasonable probability requirement because, after officers testified as to what a security video would have shown occurred during a prison altercation, the defendant "provide[d] no description, testimony, or other evidence establishing what the video would have shown and how that would have impeached the officers' testimony"). Because Dew proffered no evidence that Wife had used the silver laptop or that any of her devices contained child pornography, he has failed to demonstrate a reasonable probability that the silver laptop contained exculpatory evidence.

¶42 For the foregoing reasons, we affirm the district court's denial of Dew's motion to dismiss.

## II. Sufficiency of the Evidence

¶43 We next address Dew's claim that the district court erred by denying his motions for a directed verdict and to arrest judgment, which were both based on asserted insufficiency of the evidence. We conclude that the court did not err by denying these motions.

¶44 "When we consider an insufficiency of the evidence claim, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Nielsen*, 2014 UT 10, ¶ 46, 326 P.3d 645 (cleaned up). "We may reverse a verdict only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable

minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *Id.* (cleaned up). This is true even when the evidence is "largely circumstantial." *Id.* ¶ 45. Indeed, "[s]ustainable verdicts are entered every day on the sole basis of circumstantial evidence." *Id.* ¶ 47. "Direct evidence is not required." *Id.* Thus, "where the jury returns a verdict that is reasonably sustained by circumstantial evidence and the inferences drawn from it, we must uphold the jury's verdict." *Id.* We apply this standard even if "we can conceive of alternative (innocent) inferences to draw from individual pieces of evidence." *State v. Stricklan*, 2020 UT 65, ¶ 114, 477 P.3d 1251 (cleaned up). The question "is simply whether the jury's verdict is reasonable in light of all of the evidence taken cumulatively, under a standard of review that yields deference to all reasonable inferences supporting the jury's verdict." *Id.* (cleaned up).

¶45 Dew was convicted of thirteen counts of sexual exploitation of a minor for knowingly possessing thirteen images of child sexual abuse material. *See generally* Utah Code § 76-5b-201 (defining sexual exploitation of a minor). He does not contest that the evidence was sufficient to prove that thirteen images constituting child sexual abuse material had been on the black laptop, as evidenced by the discovery of the thumbcache files and carved images. What he does contest is the sufficiency of the evidence to prove that *he* was the one who possessed the black laptop and that he *knowingly* possessed the child sexual abuse material that had been on it. We conclude that the evidence was sufficient to support both findings.

¶46 Undisputed evidence showed that ICAC agents traced an IP address that shared child pornography to the home occupied by Dew and Wife and that the agents then discovered child pornography on the black laptop inside that home. Wife testified that she and Dew had purchased that laptop and were still on a payment plan when it was seized, suggesting they were its

original owners. She also testified that Dew was the nearly exclusive user of the black laptop. Wife further testified that she spent little time in the poker room, had no sexual interest in children, and had never downloaded child pornography. And a search of her devices found no child pornography.

¶47 Moreover, Analyst explained that thumbcache and carved images are not created unless the original underlying images existed on the computer at some point. Analyst testified that the scores of shellbags on the black laptop that contained names indicative of child pornography were created by the laptop's operating system when folders with those names were actually opened by a user of the computer. Similarly, Analyst testified that the link files on the black laptop that indicated the prior presence of child pornography, including a well-known child pornography series, were created when the laptop's user or operating system opened the underlying files when those files were actually on the laptop. Further, all of the suspicious link files and shellbags were linked to the username "Jon"—a shortened version of Dew's first name—and many of them were created between the hours of 11:00 p.m. and 5:00 a.m.—times consistent with Dew's swing-shift work schedule, while the black laptop contained no username corresponding to Wife's name. Finally, Analyst testified that the black laptop contained "some level of encryption," which, together with the fact that the original child pornography images appeared to have been deleted or removed, created an inference of a consciousness of guilt in the laptop's user.

¶48 The foregoing evidence supports a reasonable inference that (1) the user of the black laptop knowingly possessed the original images of child pornography whose prior presence on the laptop was evidenced by the recovered thumbcache and carved images and (2) the laptop's user was Dew, not Wife.

¶49 Dew counters by accurately observing that a defendant's constructive possession of contraband "cannot be established

solely by nonexclusive ownership or occupancy of the place where the contraband is found." *State v. Gilliard*, 2020 UT App 7, ¶ 30, 457 P.3d 1128 (cleaned up). Indeed, "a defendant's joint occupancy of the premises where the contraband is discovered must be combined *with other evidence* sufficient to establish the defendant's knowing and intentional control over the contraband." *Id.* (cleaned up). But as the preceding paragraphs demonstrate, there was ample evidence besides Dew's nonexclusive occupancy of the home to support—by reasonable inference—a finding that Dew intentionally possessed the child sexual abuse material that had been on the black laptop as evidenced by the thumbcache files and carved images that remained.

¶50    Dew also contends that there is insufficient evidence to support the verdict because there is "no evidence that [he] ever knew that the [thumbcache] images," i.e., the ones "created by the computer operating system" (as opposed to the original images underlying the thumbcache images) "ever existed or that he had ever exercised dominion and control over [the thumbcache images] or that he knew how to do so." But Dew did not make this argument below in either his motion for a directed verdict or in his motion to arrest judgment. Thus, this theory of insufficiency of the evidence was not preserved for our review. *See Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828 ("An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." (cleaned up)).

¶51    Dew further asserts that the evidence was insufficient because Wife's "testimony that it was [Dew] who primarily used the [silver and black] laptops" was "inherently contradictory and therefore improbable." In other words, Dew makes an "inherent improbability" argument under *State v. Robbins*, 2009 UT 23, 210 P.3d 288, and its progeny. But again, he did not preserve this argument for our review. *See generally State v. Doyle*, 2018 UT App

239, ¶ 19, 437 P.3d 1266 (holding that a *Robbins*-based insufficiency of the evidence argument presents a distinct "legal theory" from a general insufficiency of the evidence argument and must be separately preserved). In the district court, he did not cite *Robbins* or any of its progeny, he did not use the phrase "inherent improbability," and he did not attempt to demonstrate that Wife's testimony was physically impossible or apparently false. *See State v. Cady*, 2018 UT App 8, ¶ 20, 414 P.3d 974 (explaining that to make a *Robbins* argument, the defendant must "specify whether or how the [challenged] testimony was physically impossible or apparently false" and not simply "point[] to evidence that might have undermined the credibility of [the witness's] testimony"). Thus, Dew's *Robbins* argument is waived. *See Patterson*, 2011 UT 68, ¶ 12.

¶52 Finally, Dew argues (as he did below) that the evidence was insufficient because "[t]here was no evidence that the [child pornography] images were accessed by someone on or about the date alleged in the [i]nformation." It is true that in some cases the State must prove exactly when a crime occurred, such as "when time is an express statutory element" or when the defendant asserts certain defenses, including that "a statute of limitations" has run or that "the age of the victim or the defendant" precludes the illegality of the act. *State v. Fulton*, 742 P.2d 1208, 1213 (Utah 1987). But no such circumstance is present here. Therefore, whether Dew knowingly possessed the images during the precise period alleged in the information is irrelevant.

¶53 For the foregoing reasons, we conclude that the district court did not err by denying Dew's motions challenging the sufficiency of the evidence.

### III. Closing Argument Claims

¶54 Finally, Dew contends that "the district court committed plain error when it failed to intervene in the State's improper closing argument that appealed to the passions and prejudices of

the jurors [by urging them] to give a voice to and protect child victims." Relatedly, Dew contends that Counsel rendered ineffective assistance by not objecting to the same argument. We agree that the prosecutor's argument included inappropriate elements, but we do not agree that the court's failure to intervene was plain error or that Counsel's failure to object constituted ineffective assistance.

## A. Plain Error

¶55  "To establish plain error, a defendant must show that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error was harmful." *State v. Corry*, 2024 UT App 142, ¶ 25, 558 P.3d 128 (cleaned up). The focus of a plain error analysis, however, is "not whether *the prosecutor* made missteps but whether *the trial judge* committed reversible error." *State v. Hummel*, 2017 UT 19, ¶ 113, 393 P.3d 314 (emphasis added).

¶56  Although our focus is ultimately on whether the district court plainly erred, we begin by acknowledging that the prosecutor's argument in this case was improper. In *State v. Todd*, 2007 UT App 349, 173 P.3d 170, a murder case, the prosecutor "made several impassioned references" to what the victim "might have told the jury had she been alive to testify." *Id.* ¶ 21 (cleaned up). We explained there that "such a strategy during closing argument is a highly risky and improper rhetorical device that should be scrupulously avoided" because such statements invite the jury to "feel obligated to seek revenge for the victim" instead of basing its verdict on "a disinterested, impartial and fair assessment of the testimony that has been presented." *Id.* (cleaned up). Similarly, in *State v. Wright*, 2013 UT App 142, 304 P.3d 887, we held that a prosecutor's statement that the jury had "the power to make [the charged sexual abuse] stop" was improper because it suggested that the jury had "a duty to protect the alleged victim" and, thus, distracted "from [its] legal duty to impartially apply the law to the facts." *Id.* ¶ 41 (cleaned up).

¶57 The prosecutor's strategy here was in the same vein. He told the jury that "why [it was] here" and why the case was "important" was because the images Dew was charged with possessing were not "just images"—they were "kids [who] can't speak," kids who "[c]an't call for help," and kids who were "being traded like baseball cards." These statements improperly called on jurors to issue a verdict based on a desire to protect and vindicate the voiceless and victimized children instead of one based on a fair and impartial review of the evidence as to whether Dew actually committed these crimes.

¶58 In support of the assertion that the prosecutor's argument was not improper, the State notes that "prosecutors have considerable freedom to discuss the evidence 'and the inferences and deductions arising therefrom.'" (Quoting *State v. Bryant*, 965 P.2d 539, 550 (Utah Ct. App. 1998).) This is true. However, this well-established principle applies to properly admitted evidence and reasonable inferences that may be drawn from it. It does not apply to matters that a jury is plainly not to consider, such as protecting a victim, seeking retribution, or otherwise resting its verdict on an impermissible basis. Prosecutors have no latitude to discuss these topics.

¶59 The State also contends that the prosecutor's argument was not improper because he "expressly told the jury he was '*not* asking'" it to convict Dew based on the children's inability to speak for or protect themselves and, instead, "was asking [it] to convict Dew based on the 'evidence.'" Stated another way, the State suggests that prosecutorial misconduct may be ameliorated by the prosecutor telling the jury that he or she is not engaging in the misconduct. Not so. The prosecutor's argument remained inappropriate even after he told the jury he was not asking it to render a verdict on an improper basis.

¶60 Although the prosecutor's statements were improper, they do not require reversal. As noted, the question we ultimately must

answer is whether the district court plainly erred by not sua sponte intervening during the prosecutor's argument. And on this point, our supreme court has explained,

> Such a course is often a perilous one for a trial judge. A judge who interrupts a closing argument to question the basis for a lawyer's statement risks treading on the toes of opposing counsel—of highlighting a point that counsel may prefer to ignore, in the hopes that it may go unnoticed or at least minimized by the jury. So a judge who does so must be certain that the attorney's statement is both highly prejudicial and obviously beyond the bounds of the considerable latitude of counsel at closing to discuss fully from their viewpoints the evidence and the inferences and deductions arising therefrom.

*State v. Hummel*, 2017 UT 19, ¶ 119 n.35, 393 P.3d 314 (cleaned up).

¶61 While improper, the prosecutor's statements here were not highly prejudicial such that the court was required to intervene. Before making the objectionable statements, the prosecutor's argument focused on the testimony by Agent, Wife, Analyst, and other law enforcement officers; on why the prosecutor believed the testimony was credible; and on the reasonable inferences that could be drawn from it. And after making the statements at issue, the prosecutor again directed the jury to focus on the evidence. While this did not change the impermissibility of the statements, the prosecutor's otherwise methodical focus on the evidence, coupled with the strength of that evidence, did affect the degree to which his inappropriate statements were prejudicial. And we are not convinced that the district court should have viewed them as highly prejudicial.

¶62 Counsel's response to the improper statements further highlights why the district court reasonably would hesitate to

interject itself. After the prosecutor's argument, Counsel began his argument by acknowledging that "a crime was committed" and that "child pornography is horrible." He then cautioned the jury to not "let that cloud [its] vision as to determining who did it." He then acknowledged again that child pornography "is a horrible and brutal thing." The court might very well have anticipated the possibility that Counsel would want to capitalize on the prosecutor's improper statements by essentially agreeing with them, thereby gaining credibility with the jury before shifting focus to the theme he had introduced in his opening statement—that "this is truly a case of whodunit." In short, "[w]e are in no position to question the trial judge's decision here to sit silent in the absence of an objection." *Id.*

## B. Ineffective Assistance

¶63   For similar reasons, we conclude that Counsel did not provide ineffective assistance by not objecting to the prosecutor's argument. "To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense." *State v. Miller*, 2023 UT App 85, ¶ 25, 535 P.3d 390 (cleaned up), *cert. denied*, 540 P.3d 78 (Utah 2023). "A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *Id.* (cleaned up). Here, we resolve Dew's claim under the deficient performance element.

¶64   To establish deficient performance, "a defendant must show that counsel's representation fell below an objective standard of reasonableness." *State v. Lee*, 2014 UT App 4, ¶ 13, 318 P.3d 1164 (cleaned up). "In evaluating whether counsel was deficient, we will not second-guess trial counsel's legitimate strategic choices. Rather, if there is a conceivable tactical basis for counsel's actions, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* ¶ 17 (cleaned up).

¶65    As we have intimated, *see supra* ¶ 62, Counsel made a legitimate strategic choice by not objecting to the prosecutor's improper argument. By not objecting, Counsel avoided potentially losing credibility with the jury by appearing—through an objection—to disagree with the compelling (though irrelevant) notion that child pornography victims need a voice and vindication. Instead, by conceding the force of the prosecutor's statements and acknowledging the reprehensibility of the charged conduct, Counsel placed himself on similar moral footing to the prosecutor before arguing that the evidence did not prove beyond a reasonable doubt that Dew was the one who engaged in it. Dew has not overcome the presumption that Counsel's decision had a sound strategic basis, and his ineffective assistance claim therefore fails.

CONCLUSION

¶66    We see no error in the district court's denial of Dew's pretrial motion to dismiss based on an asserted violation of due process. We also see no error in the court's denial of Dew's motion for a directed verdict and motion to arrest judgment based on arguments of insufficient evidence. We conclude that the court did not plainly err when it did not intervene in response to the prosecutor's objectionable statements during closing argument, and we likewise conclude that Counsel was not ineffective for not objecting to those statements. Accordingly, we affirm.